Motion to quash writ denied, with ten dollars costs.

---

ISIDOR STRAUS and NATHAN STRAUS, Composing the Firm of R. H. MACY & COMPANY, Appellants, *v.* AMERICAN PUBLISHERS' ASSOCIATION and Others, Respondents.

*Combination to restrict competition in the price of books — when illegal under chapter 690 of the Laws of 1899.*

A large number of book publishers, who published ninety-five per cent of all books published in the United States, organized a membership corporation under the laws of the State of New York, and thereafter the corporation and the members thereof entered into an agreement, by which each member of the corporation agreed that all copyrighted books published by any of them should be sold at retail at the published price thereof; that they would sell books,

whether copyrighted or not, or whether published by them or not, only to such booksellers as would maintain the retail price of the copyrighted books, and only to those booksellers and jobbers who would sell books at wholesale to no one who was known to them to cut or sell such copyrighted books at a lower figure than the retail price, and not to any one whose name should be given to them by the association as one who had cut such prices.

Through the efforts of the corporation and its members, a voluntary association of booksellers, composing a large majority of the wholesale and retail booksellers in the United States, was organized, who co-operated with and assisted the corporation and the members thereof in establishing and maintaining the prices of copyrighted books.

*Held*, that the combination or arrangement in question was prohibited by section 1 of chapter 690 of the Laws of 1899, which provides: " every contract, agreement, arrangement or combination whereby a monopoly in the manufacture, production or sale in this State of any article or commodity of common use is or may be created, established or maintained, or whereby competition in this State in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within this State of the manufacture, production or sale of any such article or commodity, the free pursuit in this State of any lawful business, trade or occupation is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void."

That books are an article or commodity of common use within the meaning of the statute;

That the fact that the arrangement related to copyrighted books did not render the combination lawful, as the Copyright Law does not give the publisher any right to control the resale of the book after it has once been sold by him.

*Semble*, that the statute in question does not attempt to prevent a single manufacturer of an article or commodity of common use from fixing the price at which he will sell such article or prevent such a manufacturer from agreeing with a purchaser of the article that such purchaser will not resell the article at a price less than that fixed by the manufacturer or prevent the manufacturer from making an agreement to give special facilities to a customer who lives up to such an agreement.

VAN BRUNT, P. J. and McLAUGHLIN, J., dissented.

APPEAL by the plaintiffs, Isidor Straus and another, composing the firm of R. H. Macy & Company, from an interlocutory judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 27th day of January, 1903, upon the decision of the court, rendered after a trial at the New York Special Term, sustaining the defendants' demurrers to the plaintiffs' complaint.

*Edmond E. Wise* and *John G. Carlisle*, for the appellants.

*Stephen H. Olin,* for the respondents American Publishers' Association and others.

*Thaddeus D. Kenneson,* for the respondents Walcott, individually, and others.

INGRAHAM, J. :

The plaintiffs, who are the proprietors of what is called a department store in the city of New York, are engaged in connection with their retail business in selling books and other publications, and as such complain of the action of the defendants and others in their endeavor to prevent them from purchasing and selling books without joining with these defendants in an agreement that all books sold by them are to be sold at a net price to be fixed by the publishers of the books. They have asked for an injunction restraining the defendants from carrying on this combination or arrangement, which the complaint alleges has been made between substantially all the publishers of books and those engaged in retailing books to the public; and they also ask to recover the damages sustained because of this combination or arrangement which is alleged to be illegal and in violation of the laws of this State. The defendants demurred to the complaint upon the ground that it does not state facts sufficient to constitute a cause of action, which demurrers were sustained upon the decision of this court in *Park & Sons Co.* v. *Nat. Druggists' Assn.* (54 App. Div. 223; since affd. by the Court of Appeals, 175 N. Y. 1).

In determining the legality of the combination or arrangement here complained of, the test is whether the arrangement or combination as alleged in the complaint is within the statutory prohibition. (Laws of 1899, chap. 690.) This statute is not referred to either in the opinion of this court in the *Park* case or in the prevailing opinion of the Court of Appeals, for the reason, I suppose, that it was not in force when the arrangement or combination complained of was made, or when that action was commenced. It is referred to incidentally by Judge MARTIN in his dissenting opinion in the Court of Appeals, but only as a declaration of the law of this State, which he considered was violated by the contract or combination which was alleged in that case.

In determining the question now before us, it is well first to con-

sider just what the statute in question prohibits; and then to determine whether the arrangement or combination as set forth in the complaint in this action violates that statute. Just what relief may be granted if the combination is prohibited by the statute, it is not important now to determine, for I take it that if the combination or arrangement as alleged in the complaint is declared by the statute to be against public policy, illegal and void, one who is directly affected by such an illegal combination or arrangement is entitled to appeal to the courts for redress either to restrain the continuance of the illegal acts which result from the illegal combination, or to recover the damages caused by such combination.

Section 1 of the act (Laws of 1899, chap. 690), which in this respect is a re-enactment of section 1 of chapter 383, Laws of 1897, provides that " every contract, agreement, arrangement or combination whereby a monopoly in the manufacture, production or sale in this State of any article or commodity of common use is or may be created, established or maintained, or whereby competition in this State in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within this State of the manufacture, production or sale of any such article or commodity, the free pursuit in this State of any lawful business, trade or occupation is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void." Clearly the intent is to prohibit every arrangement or combination whereby the supply or price of any article or commodity of common use may be fixed or regulated by the agreement of those producing or dealing in such article or commodity, or in any other way except by the free competition of the manufacturers and dealers in such article or commodity. Any agreement among manufacturers which limits the amount which each is to manufacture would be an agreement whereby competition in the supply of the articles covered by the contract may be restricted; and any contract, agreement, arrangement or combination among manufacturers which fixes the price at which articles should be sold by those who had become their owners by purchase from the manufacturers, would be a contract, agreement, arrangement or combination by which competition in the price of such

articles may be restricted or prevented, and a combination by which all dealers in a specific article who should refuse to sell it at a price fixed by the manufacturer would be prevented from carrying on their business, would be directly within the condemnation of this statute.

This statute does not attempt to prevent the manufacturer of any article from fixing any price at which he would sell the manufactured article. It does not attempt to provide that such a manufacturer may not agree with a customer that the customer shall not sell the article that he had purchased from the manufacturer at a price less than that fixed by the manufacturer, or that the manufacturer may not agree to give special facilities to the customer who lives up to such an agreement, and that was the question presented in *Walsh* v. *Dwight* (40 App. Div. 513). But when an article thus manufactured has passed out of the hands of the manufacturer and has come into the ownership of dealers engaged in general business, a combination between all manufacturers that any dealer who presumed to sell the article thus manufactured at a price below that at which the manufacturers had fixed as the retail price should thereafter be cut off from all opportunity to purchase articles of a similar character, is, it seems to me, a combination which would tend to restrain the free sale of the article thus manufactured and sold, and would restrain or prevent competition in the price of the article. What is declared to be illegal is any contract, agreement, arrangement or combination whereby competition in the supply or price of any article or commodity of common use may be restrained or prevented. If all the manufacturers of flour in the United States should join in an agreement that all flour must be sold to consumers at ten dollars per barrel, and that any retailer who sold flour at a lower price should not be allowed to purchase flour from any of those engaged in the combination, or that any third party who sold to such dealer any flour, no matter where he obtained it, could thereafter have no dealings with any member of the combination and purchase no flour from them, this would certainly be a combination or arrangement which would restrain competition in the supply or price of flour, and would be illegal. Although each manufacturer in the United States could agree that he would not sell any flour manufactured by him at a less price than ten dollars per barrel, when he attempts by combining with other manufactur-

ers to prevent the flour when sold from being dealt in in the market except at the price fixed by him, he attempts to restrict the free competition in the price of that flour. It matters not by what plan or method this result is sought to be accomplished, if a contract was made for that purpose and methods were adopted which tended to carry that purpose into effect, it comes within the prohibition of the statute and attempts to accomplish what the statute declares shall be illegal. It is the competition in the supply or price which is to be preserved, and any contract or arrangement or combination having for its object a restraint upon or interference with such competition, either in regard to the supply or the price, is declared illegal.

In *Matter of Davies* (168 N. Y. 89) the Court of Appeals said in regard to this statute: "Its object is to destroy monopolies in the manufacture, production and sale in this State of commodities in common use; to prevent combinations in restraint of competition in the supply or price of such commodities, or in restraint of the free pursuit of any lawful business, trade or occupation. The act in this respect is little more than a codification of the common law upon the subject, and its validity, to this extent, is not and cannot be successfully questioned in view of a long line of authorities." This being the effect of the statute, the question is, whether the combination entered into between these defendants is by the act declared to be against public policy, illegal and void. The complaint is quite voluminous, but a general statement of the nature of the combination alleged is sufficient for the determination of the question before us.

It is alleged that the defendant, the American Publishers' Association, is a membership corporation, organized and existing under the laws of this State. The members of this association are the publishers of books, engaged in business in a number of the States of the United States and comprise ninety-five per cent of the publishers of books in the United States who published ninety-five per cent of all books published in the United States. There are made parties defendants in this action a large number of members of this corporation. Of these, eleven are corporations organized under the laws of this State, eleven are copartnerships doing business within this State, and one is a foreign corporation. The purpose for which this corporation was organized is thus alleged: "That during the

year 1900 a number of prominent publishers, including the defendants hereinbefore described as publishers, for the purpose of securing to themselves an unreasonable and extortionate profit, and at the same time with the intent to prevent competition in the sale of books, and for the purpose of establishing and maintaining the prices of all books published by them or any of them, and all books dealt in by them or any of them, and preventing competition in the sale thereof, * * * combined and associated themselves together, and as a part of such unlawful combination or scheme formed or incorporated the defendant, the American Publishers' Association, a membership corporation, which included amongst its members the defendants hereinbefore described as publishers, and also a large majority of the publishers of all books in the State of New York and throughout the States of the United States." It is thus alleged that these defendant corporations, organized under the laws of this State, as well as individuals doing business here, to accomplish a purpose which was prohibited by law, organized a corporation under the laws of the State, thus using for this illegal purpose the general law authorizing the formation of corporations. The complaint then alleges that to carry out this intent the corporation adopted a resolution and entered into an agreement which was intended to prevent the cutting or reducing of prices on all copyright books published by the members of the association, "by which each of the members of the association agreed that all copyrighted books published by any of them after May 1st, 1901, should be published and sold at retail at net prices, that is, the published price thereof, and not be subject to any discounts;" that the members of said association agreed "that such net copyrighted books, and all other books, whether copyrighted or not, or whether published by them or not, should be sold by them to those booksellers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books at wholesale to no one known to them to cut or sell at a lower figure than such net retail price, and not to one whose name would be given to them by the association as one who had cut such net prices; and that a dealer or bookseller was defined as one who makes it a regular part of his business to sell books and carry a stock of them for public

sale." The complaint further alleges that through the efforts and influence of this corporation and its members the American Booksellers' Association, a voluntary association which was composed of a large majority of booksellers at wholesale and retail throughout the United States, was organized; that in pursuance of this combination and agreement the said American Booksellers' Association and its members have continuously co-operated with and assisted the American Publishers' Association and the members thereof in establishing and maintaining the prices of such books, and preventing competition in the supply and sale of the same, and still continue so to do; and that "in compliance with said agreement, neither of said associations nor any of the members thereof, will sell or supply books at any price to any dealer, whether a member of said association or not, and whether such books are copyrighted or not, or are not published by said American Book Publishers' Association or its members, who resells or is suspected of reselling such copyrighted books at less than the arbitrary net price fixed by said unlawful combination, nor will the said associations nor any of their members sell or supply any books whatever to any one who resells or is suspected of reselling such copyrighted books to any dealer who thereafter sells the same at less than such arbitrary net price." It is further alleged that, "for the purpose of forcing and compelling the plaintiffs to join such illegal and unlawful combination, and of inducing and coercing them to maintain an enhanced uniform price of books at retail, the defendants conspired to injure the plaintiffs in their said business of selling books, and by threats, coercion and intimidation, sought, and by like means, are still seeking, to prevent all persons engaged in the business of publishing or buying and selling books, at wholesale or retail from dealing with the plaintiffs;" that the defendant corporation and the American Booksellers' Association, in their monthly bulletins and official publications and otherwise, have wrongfully attacked and falsely and maliciously misrepresented these plaintiffs, "and in every way sought to cast reproach upon them, and to intimidate all persons, both members and non-members of the associations, from selling them books, and to prevent all publishers, although not members of the association, from likewise furnishing them with books, although said publishers and dealers would be will-

ing so to do but for the threats of defendants, and that from time to time they issued circular letters to the trade, including dealers and publishers outside of said combination, some of which were marked confidential, blacklisting the plaintiffs and warning all persons against doing business with them, and threatening to injure and destroy the business of any dealer or publisher who should sell books to these plaintiffs;" that "by reason of the unlawful agreement to maintain prices and prevent competition, and the unlawful conspiracy among the defendants to prevent the plaintiffs from purchasing any books and selling them at such prices as to them seem desirable, and the intimidations and threats broadly published and widely circulated by the defendants, many dealers and publishers, both those belonging to said associations and others, have refused to sell books at any price to the plaintiffs, to their great damage, although such publishers and dealers have signified their willingness to deal with plaintiffs but that they feared injury from the defendants in their business;" and that "the defendants still continue all said unlawful acts, and threaten to continue the same, to the great injury and damage of plaintiffs, and that plaintiffs have no adequate remedy at law."

Does this combination or arrangement violate the provisions of this act which we have before considered? It is alleged and admitted that the defendants who were the publishers of books, with the intent to prevent competition in the sale of books, and for the purpose of establishing and maintaining the prices of all books published by them, or any of them, and all books dealt in by them, and preventing competition in the sale thereof, combined and associated themselves together, and to carry out that combination incorporated the defendant, the American Publishers' Association. Having thus secured a corporate franchise from the People of the State, the members of this corporation organized a voluntary association of those engaged as wholesale and retail dealers in books, and have agreed among themselves that any bookseller who attempts to sell books which he has purchased at a less price than that fixed by the publishers shall not be allowed to purchase any books, either from the members of the corporation or from the members of the voluntary association, or from any other dealer in books, and have threatened that if any dealer in books should sell to such a book-

seller, he will be prevented from buying any books from any member of the association, or from any dealer dealing with the members of either the corporation or the association. And this combination comprises ninety-five per cent of the publishers of books in the United States and Canada, and the Booksellers' Association comprises a large majority of all dealers in books not publishers.

What is the object of this combination which includes the publishers and sellers of books? What is the effect of the corporate action of this corporation and of its members in carrying out the intent with which the combination (which includes the formation of the corporation and the voluntary association) was formed? Was not the nature and object of the combination to compel every dealer in books to fix the selling price of each book owned by him at the price designated by the publishers of the books? If that was the nature and object of the arrangement or combination, is it not clear that by it competition in the price of books is or may be restrained or prevented? I can conceive of but one answer to these questions. What competition in the price at which books are sold or retailed can exist if these defendants, constituting as they do ninety-five per cent of the publishers of books in the United States and Canada, can carry out the object and intent of this combination? For no bookseller who sells a book at a less price than that fixed by the publishers can obtain a book to sell. If he sells a book at a less price than that fixed, the members of the association who are the publishers of the book will sell him no books. If he goes to a bookseller to purchase books and they sell him, the bookseller's supply is at once cut off. If this agreement could be carried out, all competition in the price of books would necessarily be at an end.

It is said, however, that as this arrangement related to copyrighted books which each publisher has a sole right to publish and sell, the agreement is merely carrying out their monopoly given by the Copyright Law (U. S. R. S. § 4952 *et seq.*, as amd. by 26 U. S. Stat. at Large, 1107) and is not, therefore, a violation of the statute in question; but I do not understand that the Copyright Law gives to a publisher any right in the book when once it is published and sold. It is true that he has a right to sell as many copies as he pleases, but so he has the right to sell any other book he pleases

upon the same conditions.   The monopoly that the copyright gives is that no one else shall print or publish the book upon which the copyright exists, and of course every publisher can enforce that right. But when a publisher of a copyrighted book once sells the book, the Copyright Law gives him no right to prevent its being sold by the person to whom he sells it or to interfere in any way with the property right of the purchaser in the book which has been sold by the person owning the copyright.   The publisher of a copyrighted book certainly cannot sell and receive the price and still own and control the book.   He can prevent any other publisher from publishing and selling it, but the book once sold becomes the property of the purchaser, and neither the publisher nor the author can interfere with the ownership of the book that the publisher has sold.

We have discussed this question without reference to any of the cases upon this subject, relying solely upon the language used in the statute, with the evident intent of the Legislature that passed it, and having ascertained what was declared to be illegal, we have examined the provisions of the combination or arrangement as alleged in relation to the prohibition contained in the statute. In none of the cases to which our attention has been called has the Court of Appeals defined just what contract or combination is within the prohibition contained in this statute.   The court at Special Term sustained this demurrer upon the ground that the case of *Park & Sons Co.* v. *Nat. Druggists' Assn.* (*supra*) was controlling, but in that case the provisions of this statute were not considered, as the combination therein complained of was formed long before the statute was enacted and the action itself was commenced prior to that time.

In the *Park* case there was an interesting discussion as to whether the combination in that case was void at common law, and the validity of that agreement was placed by a majority of the court, as I read the opinions, upon the ground as stated by Judge HAIGHT that the arrangement " does not operate to restrict sales in any localities, but contemplates a ready method of distributing the goods throughout the entire country.   It is, in effect, the creating of an agency on the part of the proprietors by which every druggist throughout the United States may receive the goods and dispose of them as agents of the principal, receiving the commissions agreed

upon therefor." The agreement, as construed by the court in that case, was : "The manufacturer says to the jobbers of the country, I manufacture a medicine that I will sell for one dollar a bottle, and it is my desire that it shall be sold at that price per bottle throughout the country. If you will take consignments of this medicine from me, billed to you, at that price per bottle, I will allow you a rebate of ten per cent, and if I find that you are selling at a lower price than billed to you, I will allow no rebate. If this arrangement is not satisfactory to you, I prefer to keep my manufactured stock on hand. These are the only conditions under which I will ship my manufactured article." Thus the only effect of the agreement was that the manufacturers or proprietors refused to allow a rebate on the price that they had fixed for their goods to those dealers who refused to sell at the retail price fixed, and the reason that the plaintiff objected to this plan is thus stated by Judge Haight : "The meaning of these allegations is obvious. It is that the plaintiff or the firm of John D. Park & Sons, of which the plaintiff is successor, could command large capital, and by reason of this they could purchase proprietary goods in larger quantities and more cheaply than the other wholesale and jobbing druggists, and that by reason of the adoption of the contract plan the plaintiff was unable to so do. Under the contract plan the prices of these goods were made uniform for fixed quantities, and dealers possessing large capital and thereby enabled to purchase in large quantities, could not purchase for a less sum than the ordinary wholesale and jobbing druggist, and not being able to purchase for a less sum, could not handle the goods more cheaply." Chief Judge Parker, in his concurring opinion, also emphasizes this as the object of the combination when he says that it was discovered that the "manufacturers have favorites to whom they will give a larger rebate than to wholesale dealers as a class, and generally the favorite is the person or corporation buying the greatest amount of goods, as strong firms or corporations like this plaintiff with a business of such dimensions that it claims damages in this case of one-half million of dollars. * * * That there are wholesale dealers who for the purpose of getting clients away from their competitors will give them some part of such extra rebate. To remedy this difficulty was the leading object of the association, and it was sought to be accomplished by

placing all the wholesalers upon an equality so that one should have no advantage over the other in dealing with retail dealers, a result which seems altogether desirable because it is in the line of fair dealing." And in discussing the threats that it is alleged were made against the plaintiff by the defendants it was stated that those threats were nothing more than a notice to the trade that the plaintiff " is outside of the association and prefers to stay out of it rather than be bound by the rules and regulations which other members of the trade regard as fairest and best to all, and insisting that the penalties of such a course shall be meted out to him, namely, that he shall not be allowed any rebate upon any of the manufacturers goods so long as he shall retain that position," and " it will be seen, therefore, that this is a controversy between opponents in business, neither side trying to help the public. Nor will the public be the gainer by the success of either." The dissenting opinions in that case are based solely upon the nature of the combination or arrangements between the defendants. As I understand it there was no substantial dispute about the law, but the difference arose as to the construction to be given to the agreement which it was sought to have declared illegal. Judge MARTIN in his dissenting opinion examines the authorities in this State and it is quite unnecessary for us to discuss them here. The cases to which he calls attention on pages 34, 35 and 37 of the report seem to me to condemn the arrangement or combination now under discussion. Thus, in *People* v. *Fisher* (14 Wend. 9) Chief Justice SAVAGE says that the owner of an article was not required to sell it for any particular price or for less than a stated price, but he had no right to state the price at which others should sell their goods, and that all combinations to effect such a purpose were illegal. In *Curran* v. *Galen* (152 N. Y. 33) it was held that contracts or arrangements with employers to coerce other workingmen to become members of the organization and to come under its rules and conditions under the penalty of the loss of their positions and of deprivation of employment are against public policy and unlawful, and are in conflict with the principles of public policy which prohibits monopoly or exclusive privileges. In *Judd* v. *Harrington* (139 N. Y. 105) an agreement, the real purpose of which was to suppress competition in an article of food, was forbidden by public policy and void. *Cummings* v. *Union Blue*

*Stone Co.* (164 N. Y. 401) is but an application of this same principle. Judge LANDON, in delivering the opinion of the court, there says : " But the case before us is of a different kind. It is one of such a combination among many dealers as threatened a monopoly, with which the individual would be practically powerless to compete, and the many consumers who would be severally exposed and coerced would be either compelled to submit to its exactions or to forego the purchase of the commodity of customary use needful to them, and but for this monopoly obtainable in the market at a reasonable price. The same evil principle pervades both large and small combinations ; all are alike offenders, differing in degree, but not in kind. And hence it is that contracts by which the parties to them combine for the purpose of creating a monopoly in restraint of trade, to prevent competition, to control and thus to limit production, to increase prices and maintain them are contrary to sound public policy and are void." And in *Cohen v. Berlin & Jones Envelope Co.* (166 N. Y. 292) the same principle was applied. There the court say : " The contract gave and was intended to give the parties of the second part, through the Standard Envelope Company, the exclusive right to fix prices at which manufacturers of envelopes should sell their output during the term fixed by the contract, the object being to secure a better price for the goods manufactured. Such a contract threatens a monopoly whereby trade in a useful article may be restrained and its price unreasonably enhanced, and it matters not that the parties to it may have so moderately advanced prices that the sum exacted for the product seems to some persons reasonable, for ' the scope of the contract, and not the possibility of self-restraint of the parties to it, is the test of its validity.' " And Judge CULLEN says in the *Park* Case (supra) : " But the scheme adopted goes further. It requires the manufacturer not only to sell at the same price to each jobber, but to compel each jobber to sell to the consumer at the same price by refusing to sell goods to any one who would not comply with these requirements. It is in this respect that the agreement is vicious and operates in restraint of trade, for it destroys competition among the jobbers." There is no statement in the prevailing opinions in that case that would uphold the scheme if its effect had been as thus described by Judge CULLEN, and I do not think this case is an

authority for holding that the arrangement as here alleged would have been legal at common law, but however that may be, it is, I think, clearly within the statute.

It is not seriously disputed but that books are an article or commodity of common use, and a further discussion of this question is quite unnecessary. We have the plain terms of the statute. We have a combination expressly organized for an object which the statute declares as against public policy, illegal and void. We have the fact that such a combination or arrangement has been and is being applied to prevent the plaintiffs from continuing their business, and has caused them large damage for which they have no adequate remedy at law ; and it seems to follow that, such a condition being admitted, the plaintiffs are entitled to some relief. In my view of the case the complaint stated a cause of action and the demurrer was improperly sustained.

The judgment should, therefore, be reversed, with costs, and the demurrers overruled, with costs, with leave to the defendants to withdraw demurrers and to answer, upon payment of costs of this court and in the court below.

PATTERSON and LAUGHLIN, JJ., concurred ; VAN BRUNT, P. J., and McLAUGHLIN, J., dissented.

McLAUGHLIN, J. (dissenting):

The question here presented cannot be distinguished in principle from the question presented in *Park & Sons Co.* v. *Nat. Druggists' Assn.* (54 App. Div. 223; affd., 175 N. Y. 1). In that case the manufacturers of certain proprietary articles entered into an agreement which, in effect, was to maintain the price put upon such articles by the respective manufacturers thereof. Here, the publishers of copyrighted books have entered into a similar agreement for the purpose of maintaining the price which the respective publishers put thereon. There is also an allegation in this complaint to the effect that the agreement related to uncopyrighted as well as copyrighted books, but as I read this complaint, I do not think that allegation adds anything to the one relating to the copyrighted books, because there is no allegation in it to the effect that the plaintiffs have by the act of the defendants been prevented from purchasing all the uncopyrighted books which they desire from per-

sons not members of the American Publishers' Association, or that the sale of uncopyrighted books will, by reason of the acts of any of the defendants, be restricted in any way.

Applying, therefore, the principle laid down in the *Park* case to the facts set out in the complaint, it necessarily follows, as it seems to me, that the judgment appealed from is right and must be affirmed.

VAN BRUNT, P. J.:

I concur with Mr. Justice McLAUGHLIN. I do not see why a seller of property in respect to which he has a monopoly cannot impose any conditions as to its resale that he sees fit.

Judgment reversed, with costs, and demurrers overruled, with costs, with leave to defendants to withdraw demurrers and to answer on payment of costs in this court and in the court below.