## BOBBS–MERRILL CO. v. STRAUS et al.

(Circuit Court, S. D. New York. July 11, 1905.)

1. COPYRIGHTS—SALES—RESTRICTION—NOTICE—EFFECT.

Where the publishers of a copyrighted book printed a notice on the page following the fly leaf that the price of the book at retail was $1 net, and that no dealer was licensed to sell it at a less price, and the sale at a less price would be treated as an infringement of the copyright, such notice did not purport to reserve to the publisher any interest in the book, or any right to control it or the action of its owner in the use and disposition thereof, and was insufficient to constitute a license agreement or contract restricting or modifying the absolute title acquired by purchasers.

2. SAME—INFRINGEMENT.

Where a publisher of copyrighted books voluntarily parted with all control over them by selling the books to purchasers, such purchasers were neither licensees nor agents of the publisher, though buying the books for resale, and hence such resale did not constitute an infringement of the copyright, under Rev. St. § 4964 [U. S. Comp. St. 1901, p. 3413], declaring that it is an infringement of a copyright to print or publish a copyrighted book without the consent of the proprietor given in writing, or knowingly to sell or expose for sale a copy or copies of such copyrighted book "when unlawfully printed or imported." though the books so sold each contained a notice that no dealer was licensed to sell it at a less price than that fixed by the publisher, and that a sale at a less price would be treated as an infringement of the copyright.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Copyrights, §§ 41, 47.]

3. SAME.

The act of a publisher of a copyrighted book in putting it on the market and selling it does not constitute a license to the purchaser to use and sell the same, which the publisher is entitled to restrict by a notice brought to the attention of the purchaser that the sale of the book at retail for less than the price fixed by the publisher shall be considered an infringement of the copyright.

4. SAME—COMBINATIONS IN RESTRAINT OF TRADE—INTERSTATE COMMERCE.

Where the publishers and booksellers of the United States organized two membership associations, one known as the "American Publishers' Association," and the other as the "American Booksellers' Association," and together controlled the publication and sale of at least 90 per cent. of all copyrighted books, the objects of which were to compel owners and dealers of such books to purchase them of the members of the combination at an arbitrary price fixed by it, regardless of the actual value of the books as determined by a demand in an open market, or the condition of the books, and to compel all publishers and dealers of such books to come into the combination, be controlled by it, and sell books at prices fixed by it, regardless of the value of the books or of the exigencies of the trade and situation of the seller, or be deprived of the privilege of purchasing, owning, and selling such books through a system of blacklisting, etc., the effect of which would be to cripple the business of any publisher or bookseller outside of the combination, such agreement was a violation of the Sherman anti-trust law (Act Cong. July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), declaring that every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce among the several states is illegal.

[Ed. Note.—For cases in point, see vol. 35, Cent. Dig. Monopolies, § 13.]

In Equity.

Suit to enjoin the sale at retail of books containing a copyright novel, "The Castaway," at a price less than $1 for each copy of the book. Such sales of such book are alleged to be in violation of the terms of a notice printed in each copy thereof upon the page immediately following the title-page and immediately below the statutory copyright notice. Defendants insist that the books containing such novel have been lawfully printed for sale to the general public, and to be read by the general public, and put upon the market and sold, and that the right of the owners of such books to sell same at such price as they severally may see fit to ask cannot be and is not limited or affected by the notice. They also insist that this suit is to enforce an unlawful combination and agreement, and press other defenses.

Boardman, Platt & Soley (W. H. H. Miller, Albert B. Boardman, and Henry W. Clark, of counsel), for complainant.

Spiegelberg & Wise (John G. Carlisle and Edmond E. Wise, of counsel), for defendants.

RAY, District Judge (after stating the facts as above). The main facts in this case are not disputed. They may be stated as follows:

(1) The Bobbs-Merrill Company, the complainant, is, and at all times mentioned in the bill of complaint was, a corporation duly organized and existing under the laws of the state of Indiana, engaged in the business of publishing and selling books, and having its principal office in the city of Indianapolis, in the state of Indiana.

(2) The complainant is, and at all times mentioned in the bill of complaint was, the owner and proprietor of a book or novel in one volume, entitled "The Castaway," written by Hallie Erminie Rives.

(3) The allegations contained in paragraphs of the bill of complaint numbered III to VI, inclusive, relating to the complainant's compliance with the copyright laws of the United States, are true. Such paragraphs read as follows:

"III. That your orator is the proprietor of a copyright book or novel in one volume, entitled and known as 'The Castaway.' That the author of said book was Hallie Erminie Rives. That prior to the publication of said book, and prior to the month of May, 1904, the author thereof, said Hallie Erminie Rives, duly sold, assigned, and transferred to your orator all her right, title, interest, and property in and to said book, and your orator thereupon became, and at all times since said sale has been, and still is, the sole and exclusive proprietor and owner thereof.

"IV. That your orator, being then proprietor of said book as aforesaid, and desiring to secure a copyright thereof, before the day of publication of said book duly deposited in the mail within the United States, to wit, in the city of Indianapolis, in the state of Indiana, addressed to the Librarian of Congress, at Washington, District of Columbia, a printed copy of the title of said book, and duly paid to said Librarian of Congress the fees required by law, to wit, fifty cents, for recording said title, and your orator did also, not later than the day of publication of said book in this or any foreign country, to wit, on the 24th day of May, 1904, deposit in the mail within the United States, to wit, in the city of Indianapolis, in the state of Indiana, addressed to the Librarian of Congress, at Washington, District of Columbia, two copies of said book printed from type set within the limits of the United States.

"V. Your orator is informed and verily believes, and therefore avers, that the Librarian of Congress on the 18th day of May, 1904, duly recorded the name and title of said copyright book in pursuance of the statute in such case made and provided.

"VI. That your orator has given due notice and information of its said copyright by inserting and printing in each and every copy of said book published, upon the page immediately following the title-page thereof, the words and figures: 'Copyright 1904. The Bobbs-Merrill Company. May.' "

(4) No copies of "The Castaway" were sold or otherwise issued prior to securing the copyright thereon.

(5) Each and every copy of "The Castaway" printed, published, or issued by complainant contained at the time of such publication and issue the following notice, printed upon the page of the book immediately following the title-page, and just below the statutory copyright notice:

"The price of this book at retail is one dollar net. No dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an infringement of the copyright. The Bobbs-Merrill Company."

(6) The defendants in the course of their business procured copies of said book before the commencement of this suit for the purpose of sale at retail. The defendants purchased 90 per cent. of said copies from dealers at wholesale at a reduction from said specified retail price of about 40 per cent., and 10 per cent. of said copies they purchased at retail, paying the full retail price therefor.

(7) Defendants at the time of their purchase of copies of said book knew that said book was a copyright book, and were familiar with the terms of the notice printed in each copy thereof, as described in paragraph 5 of this statement, and knew that this notice was printed in every copy of said book purchased by them.

(8) The wholesale dealers, from whom defendants purchased copies of said book, obtained the same either directly from the complainant or from other wholesale dealers at a discount from the net retail price, and at the time of their purchase knew that said book was a copyright book, and were familiar with the terms of the notice printed in each copy thereof, as described in paragraph 5 of this statement, and such knowledge was in all wholesale dealers through whom the books passed from the complainant to defendants. But said wholesale dealers were under no agreement or obligation to enforce the observance of the terms of said notice by retail dealers or to restrict their sales to retail dealers who would agree to observe said terms.

(9) The defendants have sold copies of said book at retail at the uniform price of 89 cents a copy, and are still selling, exposing for sale, and offering copies of said book at retail at said price of 89 cents per copy, without the consent of the complainant.

(10) That during the year 1900 a large number of publishers in the state of New York and throughout the states of the United States entered into an agreement for the purpose of maintaining the net retail price of copyrighted books published by any of them as designated by the publisher of each book, and to prevent the sale at retail of any such copyrighted books by any dealer at retail at less than said fixed net retail price. That pursuant to that agreement a membership corporation was formed under the laws of the state of New York under the name of the "American Publishers' Association," which included among its members the complainant herein and a large majority of the publishers of all books, copyrighted or uncopyrighted, in the state of New York and throughout the United States.

(11) That immediately after the incorporation of said American Publishers' Association a resolution was adopted and its members entered into agreements with each other and with the American Publishers' Association, a copy of which is as follows:

Exhibit A.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"The following plan to correct some of the evils connected with the cutting of prices on copyright books was adopted at the meeting of the American Publishers' Association held February 13, 1901:

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be-

published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, such works of fiction (not juveniles) and new editions as the individual publisher may desire, books published by subscription and not through the trade, and such other books as are not sold through the trade.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that such net copyrighted books and all other of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"IV. That the only exception to the rule of maintaining the retail price shall be in the case of libraries, which may be allowed a discount of not more than 10 per cent. Libraries entitled to this discount may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount.

"V. That the association suggests a discount on net copyrighted books of twenty-five per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VI. That after the expiration of a year from the publication of any such net copyrighted book dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VII. That when the publisher sells at retail a book published under the rules, it shall be at the retail price, and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"VIII. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"IX. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"X. That the association, through its agents and members, aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which association shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to.

"XI. That the report, when adopted by the board of directors, be submitted to the association and voted upon in accordance with the association's rules, article II, section 1."

(12) That thereafter a voluntary association, called the "American Booksellers' Association," was formed, which was intended to and did include a large majority, to wit, about 90 per cent.,

both in number and extent of business, of all wholesale and retail book dealers throughout the state of New York and the United States. That the avowed purpose of this association was to co-operate with and assist the American Publishers' Association and its members in the maintenance of the so-called net price or restricted price system for the sale of books at retail, and to supply the American Publishers' Association with the names of book-sellers who cut the prices of net price or restricted books at retail, and to refrain from selling such price-cutters, or any individuals, firms, or dealers believed to be price-cutters, any books of any kind, whether copyrighted or uncopyrighted, at wholesale or at re-tail prices. That said American Booksellers' Association there-after at its annual convention in June, 1901, adopted the following resolution:

### Exhibit B.

### "Reform Resolution No. 1.

"Whereas, the American Publishers' Association has adopted a net price system and entered into an agreement for its maintainance, by which the members of said association will cut off the supply of all their books, net, copyrighted, or otherwise, to any dealer who fails to maintain the net price of any or all books published under the net price system:

"(1) Now, therefore, be it resolved, that this, the American Booksellers' Association, in convention assembled, accept the said net price system, with the distinct understanding that it is the intention of the American Publish-ers' Association to include fiction under the net price system as rapidly as possible; and

"(2) Furthermore, be it resolved, that all members of the American Book-sellers' Association shall give to each of the members of the American Pub-lishers' Association, and to all publishers who co-operate with them in the maintenance of the net price system, our most cordial support; and that to this end we agree not to buy, not to keep in stock, nor to offer for sale, after due notification, the books of any publisher who declines to support the net price system.

"(3) Furthermore, be it resolved, that we instruct our secretary promptly to notify all members of this association that this resolution is applicable and in force with reference to any publisher who shall have made it manifest that he is unwilling to co-operate with this association, and with the members of the Publishers' Association, in the maintenance of the net price system.

"(4) Furthermore, be it resolved, that this resolution, on being ratified by two-thirds of the members of this association, voting by formal ballot, shall immediately become a law to each and all of the members of this association; and if it shall appear, upon the presentment of any three members of this association, that a member has purchased, put in stock, or offered for sale the books of the publisher who has been formally denounced, such member shall be expelled from membership in this association, and all members of this association shall then and thereafter be restrained from supplying any books to such expelled member at a discount from the usual retail price.

"(5) Furthermore, be it resolved, that all members of this association shall be restrained from furnishing any books at less than the net or usual retail price to any dealer who shall have been denounced by the Publishers' Asso-ciation for cutting the price of net books, or for otherwise violating the net price system, and who shall have been therefor cut off by the members of the Publishers' Association from the supply of their books.

"(6) Furthermore, be it resolved, that all members of this association shall endeavor to keep in stock and push the sale of net books so long as they are reasonably in demand, provided such discount is allowed by the publishers to the dealers as will yield them a living profit; and they shall maintain

the net prices of the same in accordance with the terms of the publishers' agreement for the maintenance of the net price system.

"I [or we] vote for the adoption of Reform Resolution No. 1 as above stated.

"[Signed]     Name ............................................;

"Address............................."

(13) That thereafter and in pursuance of said agreements neither of said associations nor any of the members thereof, including the complainant, would sell or supply, or sanction the sale or supply, of any books at any price to any dealer in the state of New York, or elsewhere in the United States, whether a member of said associations or not, and whether said books were copyrighted or not, or were published by any of the members of the said American Publishers' Association or not, who did not maintain the arbitrary net retail price on copyrighted books published by the members of the American Publishers' Association, or would resell or was believed to resell such copyrighted books to any dealers who thereafter sold the same at less than the arbitrary price named by the publisher and maintained pursuant to the rules and agreements of the two associations and their members.

(14) That on or about the 8th day of January, 1902, the plan, resolutions, or agreements of the American Publishers' Association were amended by the addition thereto of the article relating to a certain discount to be allowed from the published price of works of fiction (not net) published by members of the said association, and a change in article 4 relating to discounts to be allowed to libraries, and in article 6, and the omission of article 11 of the original plan. A copy of said resolutions, with the said amended articles indicated by italics, is marked "Exhibit C." Thereafter, on the 27th day of May, 1902, the said plan, resolutions, or agreements were further amended by the addition to article 4 thereof of a paragraph relating to the sending of a work of fiction postpaid, a copy of which said resolutions as so amended is marked "Exhibit D." That thereafter, and on the 15th day of January, 1903, the said plan, resolutions, and agreements were amended by the addition to article 3 of a paragraph relating to the sale of protected books in combination with a periodical, and in article 12 a paragraph was added relating to an agreement to be entered into by all purchasers of books from the members of the Publishers' Association. A copy of said resolutions as amended is marked "Exhibit E." That thereafter, and on or about the 13th day of February, 1903, the said plan, resolutions, or agreements were again amended as to articles 1 and 4, so as to provide for the exclusion at the option of a publisher of certain copyrighted juvenile books from the class of so-called net publications, and the inclusion of such books in the class of copyrighted works of fiction not net. Article 5 was likewise amended so as to grant libraries a discount on certain juvenile books (not net), a copy of which resolutions or agreements as amended is marked "Exhibit F." That thereafter, on the 13th day of January, 1904, the said resolutions or agreements were amended as to articles 1 and 5, so as to apply to all juvenile

books, and article 4 thereof was so amended as to provide for the publication and sale of all juvenile books (not net) under the system applying to the publication and sale of copyrighted works of fiction, a copy of which said resolutions or agreements as so amended is marked "Exhibit G."

Exhibit C.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901:

"Amendments referring to fiction were adopted at a meeting held February 8, 1902.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, such works of fiction (not juveniles) and new editions as the individual publisher may desire, books published by subscription and not through the trade, and such other books as are not sold through the trade.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that such net copyrighted books and all others of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"*IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, the greatest discount allowed at retail for one year after publication shall be 28 per. cent.; and all the rules for the protection of net books shall apply to the protection of fiction to this extent. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given.*

"*V. The only exceptions to the foregoing rules shall be in the case of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33 1-3 per cent. on fiction. Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount on net books, nor to any special discount on fiction.*

"VI. That the association suggests a discount on net copyrighted books of twenty-five per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of *any copyrighted* books *issued under these regulations* dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price, and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable

person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association, through its agents and members, aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, · and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to."

### Exhibit D.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901:

"Amendments referring to fiction were adopted at meetings held January 8, 1902, and May 27, 1902.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, such works of fiction (not juveniles) and new editions as the individual publisher may desire, books published by subscription and not through the trade, and such other books as are not sold through the trade.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that such net copyrighted books and all others of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, the greatest discount allowed at retail for one year after publication shall be 28 per cent.; and all the rules for the protection of net books shall apply to the protection of fiction to this extent. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given.

"When a work of fiction published under this rule is sent postpaid, the price to the purchaser shall be not less than the minimum price plus the postage.

"V. The only exceptions to the foregoing rules shall be in the case of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33⅓ per cent. on fiction. Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount on net books, nor to any special discount on fiction.

"VI. That the association suggests a discount on net copyrighted books of 25 per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of any copyrighted book issued under these regulations, dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price, and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association, through its agents and members, aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to."

### Exhibit E.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901:

"Amendments referring to fiction were adopted at meeting held January 15, 1903.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, such works of fiction (not juveniles) and new editions as the individual publisher may desire, books published by subscription and not through the trade, and such other books as are not sold through the trade.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that such net copyrighted books and all others of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"It is further agreed by the members of the association that they will not themselves offer, nor sell their books to any one who offers, protected

books in combination with a periodical at less than the trade subscription price of such periodical, plus the net or minimum retail price of the book.

"IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, the greatest discount allowed at retail for one year after publication shall be 28 per cent.; and all the rules for the protection of net books shall apply to the protection of fiction to this extent. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given. When a work of fiction published under this rule is sent postpaid, the price to the purchaser shall be not less than the minimum price plus the postage.

"V. The only exceptions to the foregoing rules shall be in the case of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33⅓ per cent. on fiction. Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount on net books, nor to any special discount on 'fiction.

"VI. That the association suggests a discount on net copyrighted books of 25 per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of any copyrighted book issued under these regulations, dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price, and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association, through its agents and members, aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to.

"XII. That in making sales and contracts of sales of their books involving future delivery, members shall stipulate that such delivery is contingent on the observance by the purchaser of the rules of the association."

### Exhibit F.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"Plan as Amended to March 4th, 1903.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901:

"Amendments referring to fiction, juveniles, and other matters were adopted at later meetings.

"Special attention is called to changes in the following sections: 1, 3 (last paragraph), 4, 5, and 12.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, books published by subscription and not through the trade, such other books as are not sold through the trade; also, at the desire of the individual publisher, any new editions, any work of fiction (not juveniles), or any juveniles of the class that may be described as board books, flat picture books, or toy books.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book. .

"III. That the members of the association agree that such net copyrighted books and all others of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"It is further agreed by the members of the association that they will not themselves offer, nor sell their books to any one who offers, protected books in combination with a periodical at less than the trade subscription price of such periodical, plus the net or minimum retail price of the book.

"IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, and on all juvenile board books, flat picture books, or toy books (not net), published after March 1st, 1903, the greatest discount allowed at retail for one year after publication shall be 28 per cent.; and all the rules for the protection of net books shall apply to this extent to the protection of fiction and juvenile books published on the same basis as fiction. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given.

"V. The only exceptions to the foregoing rules shall be in the case of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33⅓ per cent. on fiction and juvenile board books, flat picture books, or toy books (not net). Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount on net books, nor to any special discount on fiction.

"VI. That the association suggests a discount on net copyrighted books of twenty-five per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of any copyrighted book issued under these regulations, dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price; and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board the manager shall investigate all cases of cutting reported, and, when directed, shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association through its agents and members aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important centre or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to.

"XII. That in making sales and contracts of sales of their books involving future delivery, members shall stipulate that such delivery is contingent on the observance by the purchaser of the rules of the association.

"Dated March, 1903."

### Exhibit G.

"The American Publishers' Association, 156 Fifth Avenue, New York.

### "Plan as Amended to January 14th, 1904.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901:

"Amendments referring to fiction, juveniles, and other matters were adopted at later meetings.

"Special attention is called to changes in the following sections: 1, 3 (last paragraph), 4, 5, and 12.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, books published by subscription and not through the trade, such other books as are not sold through the trade; also, at the desire of the individual publisher, any new editions, any work of fiction, or any juvenile.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that such net copyrighted books and all others of their books shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their books further to no one known to them to cut such net prices, or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale.

"It is further agreed by the members of the association that they will not themselves offer, nor sell their books to any one who offers, protected books in combination with a periodical at less than the trade subscription price of such periodical, plus the net or minimum retail price of the book.

"IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, and on all juvenile books (not net), published after April 1st, 1904, the greatest discount allowed at retail for one year after publication shall be 28 per cent.; and all the rules for the protection of net books shall apply to this extent to the protection of fiction and juvenile books published on the same basis as fiction. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given.

"V. The only exceptions to the foregoing rules shall be in the cases of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33⅓ per cent. on fiction and juvenile books (not net). Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discounts on net books, nor to any special discount on fiction or juvenile books.

"VI. That the association suggests a discount on net copyrighted books of twenty-five per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of any copyrighted book issued under these regulations, dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price; and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board, the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions.

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association through its agents and members aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to.

"XII. That in making sales and contracts of sales of their books involving future delivery, members shall stipulate that such delivery is contingent on the observance by the purchaser of the rules of the association."

(15) That thereafter, and during the month of February, 1904, in an action brought in the Supreme Court of the state of New York, it being a court of competent jurisdiction, wherein the defendants in this action were plaintiffs and the American Publishers' Association and the American Booksellers' Association and such of their respective members as were within the jurisdiction of the said court were made parties defendant, the New York Court of Appeals, being the highest appellate court in the said state, rendered its decision that the combinations and agreements described in paragraphs 10, 11, 12, and 14 of this statement were unlawful and void, and contrary to the statute law and public policy of the state of New York, and more especially of the statute law of said state known as chapter 690, p. 1514, of the Laws of 1899, which said law, for the purposes of this statement, is made part of the record. The prevailing opinion of the court, to which reference is hereby made for the

true construction of said decision, reported 177 N. Y. 473, 69 N. E. 1107, 64 L. R. A. 701, 101 Am. St. Rep. 819, is as follows:

"Isidore Straus et al., Composing the Firm of R. H. Macy & Company, Respondents, v. American Publishers' Association et al., Appellants.

"Monopolies—An Agreement Which in Effect Prevents the Sale of Uncopyrighted Books in the State is Illegal under the Anti-Monopoly Act (Laws 1899, c. 690). An agreement between publishers representing ninety-five per cent. of the books published in the United States, and ninety per cent. of the business done in the book trade, that all copyrighted books published by any of them after a specified date should be published and sold at retail at net prices; that such net copyrighted books, and all other books, whether copyrighted or not, or whether published by them or not, should be sold by them to those booksellers and jobbers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books at wholesale to no one known to them to cut or sell at a lower figure than such net retail price, or whose name would be given to them by the association as one who cut such prices; and that evidence shall not be required by the bookseller or jobber in order to restrain him from selling to one who has been blacklisted, but that all that shall be required to govern his action and to prevent him from selling to such persons shall be that the name has been given to him by the association as one who cuts such net prices—is an agreement which, while purporting to secure to the owner and publisher of copyrighted books the monopoly permitted by federal law, may, and as practically construed by the parties does, operate in fact so as to prevent the sale of books of any kind or at any price to any dealer who resells, or is suspected of reselling, copyrighted books at less than the arbitrary net price, whether such dealer be a member of the association or not. Such an agreement undertakes to interfere with the free pursuit in this state of a lawful business in which a monopoly is not secured by the federal statute, viz., that of dealing in books which are not protected by copyright. It is, therefore, in violation of chapter 690, p. 1514, of the Laws of 1899, enacted to prevent monopolies in articles or commodities of common use, and to prohibit restraint of trade and commerce.

"Straus v. American Publishers' Ass'n, 85 App. Div. 446, 83 N. Y. Supp. 271, affirmed.

"(Argued January 19, 1904; decided February 23, 1904.)

"Appeal, by permission, from an order of the Appellate Division of the Supreme Court in the First Judicial Department, entered July 30, 1903, which reversed an interlocutory judgment of Special Term sustaining demurrer to the complaint.

"Stephen H. Olin and Thaddeus D. Kenneson, for appellants. John G. Carlisle and Edmond E. Wise, for respondents.

"Parker, C. J. Chief Justice Marshall said long ago, in Grant v. Raymond, 6 Pet. 217, 241, 8 L. Ed. 376: 'To promote the progress of useful arts is the interest and policy of every enlightened government. It entered into the views of the framers of our Constitution, and the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries," is among those expressly given to Congress. * * * It is the reward stipulated for the advantages derived by the public from the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made, and to execute the contract fairly on the part of the United States, where the full benefit has been actually received, if this can be done without transcending the intention of the statute or countenancing acts which are fraudulent or may prove mischievous. The public yields nothing which it has not agreed to yield. It receives all which it has contracted to receive. The full benefit of the discovery after its enjoyment by the discoverer for 14 years is preserved, and for his exclusive enjoyment of it during that time the public faith is pledged.' That case and many

others were considered recently by the United States Supreme Court in Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, Mr. Justice Peckham writing. After an examination of the cases which may be said to restrict the exceptions which grow out of a proper exercise of the police power of the state, of which Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115, is an illustration, he says (186 U. S. 91, 22 Sup. Ct. 755, 46 L. Ed. 1058): 'Notwithstanding these exceptions, the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions keep up the contracts keep up the monopoly or fix prices does not render them illegal.' That reasoning is employed as to patent rights. It is equally applicable to copyrights, the protection of which was perhaps the leading object of the association and agreement attacked in this action. And it points to the principle underlying the decision in the Park & Sons Co. Case, 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, upon which defendants apparently rest their claim that the judgment of the Appellate Division should be reversed. But there is a feature in this case not to be found in that one, and which requires a different judgment than the one rendered therein, which will now be pointed out.

"While the leading object of this association and agreement purports to be to secure to the owner and publisher of copyrighted books that protection which the federal government permits them to enjoy for the reasons stated by Chief Justice Marshall (supra), it does not stop there. It also affects the right of a dealer to sell books not copyrighted at the price he chooses, or to sell at all, if he fails to comply with the rules of the association. A combination creating a monopoly of the sale of books not protected by copyright offends against the law of this state as much as if it related to bluestone (Cummings v. Stone Co., 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655), or to envelopes (Cohen v. Envelope Co., 166 N. Y. 292, 59 N. E. 906); and according to this complaint, which must be accepted as true on this review, such an outcome is not only possible, but probable. But it is not of moment whether such a result is probable or not; for the test to be applied is, what may be done under the agreement? Reference to the complaint makes it clear that the association has undertaken to provide for the practical exclusion from the business of selling books not protected by copyright all who refuse to be bound by the rules of the association; and it appears from the complaint that the practical construction given to this agreement by those operating together under it is that, if a dealer is suspected of selling copyrighted books at less than the arbitrary net price, it is quite sufficient to exclude him from selling books altogether. The agreement nowhere suggests that it is the object of the association to control the sale of books not protected by copyright. Indeed, the object of the association seems to be merely to protect the copyrighted books. But while the other part of the scheme is apparently sought to be hidden, it is after all uncovered by the clauses authorizing the exclusion of any members of the association, or those who refuse to be bound by its rules, from selling books of any description. The fifteenth paragraph of the complaint alleges 'that during the year 1900 a number of prominent publishers, including defendants, hereinbefore described as publishers, for the purpose of securing to themselves an unreasonable and extortionate profit, and at the same time with intent to prevent competition in the sale of books, and for the purpose of establishing and maintaining the prices of all books published by them, or any of them, and all books dealt in by them, or any of them, and preventing competition in the sale thereof, unlawfully, illegally, and contrary to the public policy and the statutes of the state of New York, * * * combined and associated themselves together,' etc. The sixteenth paragraph refers to the method of organization, and the fact of the adoption of a resolution and an agreement to carry out their object, while the seventeenth states the nature of the agreement as follows: 'That

as a part of said unlawful scheme and combination the members of said association agreed that such net copyrighted books, and all other books, whether copyrighted or not, or whether published by them or not, should be sold by them to those booksellers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books [the word "copyrighted" is omitted at this point] at wholesale to no one known to them to cut or sell at a lower figure than such net retail price, or whose name would be given to them by the association as one who cut such prices.' It will be seen that, while the leading object of this portion of the agreement apparently is to maintain the retail net price of copyrighted books, it operates in fact so as to prevent the sale of books to dealers who sell books of any kind to one who retails copyrighted books at less than the net retail price. And the agreement further provides that evidence shall not be required by the bookseller or jobber in order to restrain him from selling to one who has been blacklisted, but that all that shall be required to govern his action and to prevent him from selling to such a person shall be that the name has been given to him by the association as one who cuts such net prices. It has been admitted, and must be, that the agreement may be so worked out as to deprive a dealer from selling any books whatever, thus breaking up his business.

"But it is said that is only intended as a punishment for one who refuses to be bound by the wishes of the owner of the copyrighted book as to its selling price; in other words, that the association inflicts upon him the penalty of a destruction of his business because of his refusal to abide by the rules of the association. It is, of course, of no consequence how this course of action may be described by those who invented it; for, if it be the fact that the combination which agrees to exclude others from an unprotected business violates the statute, then it matters not what excuse may be offered for it. It is the excuse, not the statute, which must give way. The eighteenth paragraph of the complaint contains what purports to be a practical construction given to this agreement by the members of the association. It states: 'That in pursuance of said unlawful combination and agreement said American Booksellers' Association and its members have continuously co-operated with and assisted the American Publishers' Association and the members thereof in establishing and maintaining prices of such books, and preventing competition in the supply and sale of the same, and still continue so to do; and plaintiffs say that in compliance with said agreement neither said associations nor any of the members thereof will sell or supply books at any price to any dealer, whether a member of said association or not, and whether such books are copyrighted or not, or are not published by said American Book Publishers' Association or its members, who resells, or is suspected of reselling, such copyrighted books at less than the arbitrary net price fixed by said unlawful combination, nor will the said association nor any of their members sell or supply any books whatever to any one who resells, or is suspected of reselling, such copyrighted books to any dealer who thereafter sells the same at less than such arbitrary net price.' Here, then, we have a practical construction of the agreement, one put upon it by the parties to it; and it is such a construction as the language employed calls for. And it discloses that the parties who are acting under the agreement assume it to be their right and their duty by virtue of it not to sell or permit to be sold books of any kind or at any price to any dealer 'who resells or is suspected of reselling copyrighted books at less than the arbitrary net price,' whether such dealer be a member of the association or not. The intended effect of this is to prevent any dealer who is even suspected of reselling copyrighted books at less than the net price from obtaining books at any price or on any terms, whether copyrighted or not. And it does not stop there, for the members of the association agree not to supply him any books at any price, whether he resells copyrighted books or not at less than the arbitrary net price, provided he is suspected of selling to any dealer who thereafter sells the same at less than such arbitrary net price. And this means, inasmuch as the members represent 95 per cent. of the publishers and 90 per cent. of the business done in the book trade, that he may be practically driven out of the business if any one chooses to suspect

that a dealer to whom he has sold books has resold them at less than the price fixed. The members of the association, therefore, have entered into an agreement which by its terms—as we read it, and as they have construed it in their everyday working under it—undertakes to interfere with the free pursuit in this state of a lawful business in which any member of the community has a right to engage, a business in which a monopoly is not secured by the federal statutes, namely, that of dealing in books which are not protected by copyrights; and hence it is in violation of chapter 690, p. 1514, Laws 1899, which provides: 'Every contract, agreement, arrangement or combination whereby a monopoly in the manufacture, production or sale in this state of any article or commodity of common use is or may be created, established or maintained, or whereby competition in this state in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within this state of the manufacture, production or sale of any such article or commodity, the free pursuit in this state of any lawful business, trade or occupation is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void.'

"The order should be affirmed, with costs.

"Haight, Martin, Vann, and Werner, JJ., concur with Parker, C. J. Gray and Barrett, JJ., read dissenting opinions.

"Order affirmed."

That the judgment upon this decision was duly adopted by the New York Supreme Court and entered on its records.

(16) That thereafter, and on or about the 13th day of March, 1904, the said resolutions or agreements were amended as to article 3 so as to cover copyrighted books only, and so as to provide for the placing of the seller's name on the cut-off list of the association only under certain changed conditions. A copy of such resolutions as amended, with the words stricken out by said amendment indicated by brackets, and the words thereby added in italics, are hereto annexed and marked "Exhibit H."

Exhibit H.

"The American Publishers' Association, 156 Fifth Avenue, New York.

"Plan as Amended to April 1st, 1904.

"The following plan to correct evils connected with the cutting of prices on copyright books was adopted at a meeting of the American Publishers' Association held February 13, 1901 ·

"Amendments referring to fiction, juveniles, and other matters were adopted at later meetings.

"Special attention is called to changes in the following sections: 1, 3, 4, 5, 9, and 12.

"I. That the members of the American Publishers' Association agree that all copyrighted books first issued by them after May 1, 1901, shall be published at net prices, which it is recommended shall be reduced from the prices at which similar books have been issued heretofore: Provided, however, that there shall be exempt from this agreement all school books, books published by subscription and not through the trade, such other books as are not sold through the trade; also, at the desire of the individual publisher, any new editions, any work of fiction, or any juvenile.

"II. It is recommended that the retail price of a net book, marked 'Net,' be printed on a paper wrapper covering the book.

"III. That the members of the association agree that [such net] copyrighted books [and all others of their books] shall be sold by them to those booksellers only who will maintain the retail price of such net copyrighted books for one year, and to those booksellers and jobbers only who will sell their copyrighted books except at retail [further] to no one who [known to them to] cuts such

net prices [or whose name has been given to them by the association as one who cuts such prices, or who fails to abide by such fair and reasonable rules and regulations as may be established by local associations as hereinafter provided]. A dealer or bookseller may be defined as one who makes it a regular part of his business to sell books and carries stock of them for public sale. It is further agreed by the members of the association that they will not themselves offer, nor sell their *copyrighted* books to any one who offers, protected books in combination with a periodical at less than the trade subscription price of such periodical, plus the net or minimum retail price of the book.

"IV. That the members of the association agree that on all copyrighted works of fiction (not net) published by them after February 1st, 1902, and on all juvenile books (not net) published after April 1st, 1904, the greatest discount allowed at retail for one year after publication shall be 28 per cent.; and all the rules for the protection of net books shall apply to this extent to the protection of copyrighted fiction and copyrighted juvenile books published on the same basis as fiction. The conditions governing the sale of fiction are such that the association does not attempt to fix a uniform price at which works of fiction (not net) shall be sold, but only to name a maximum discount, which, however, it is hoped will rarely be given.

"V. The only exceptions to the foregoing rules shall be in cases of libraries, which may be allowed a discount of not more than 10 per cent. on net books and 33⅓ per cent. on fiction and juvenile books (not net). Libraries entitled to these discounts may be defined as those libraries to which access is either free or by annual subscription. Book clubs are not to be entitled to discount on net books, nor to any special discount on fiction or juvenile books.

"VI. That the association suggests a discount on net copyrighted books of 25 per cent. to dealers as a general discount, leaving the question of discount, however, entirely to the individual publisher.

"VII. That after the expiration of a year from the publication of any copyrighted book issued under these regulations dealers shall not be held to the above restrictions, and may sell such book at a cut price; but if, on learning of such action, the publisher shall desire to buy back at purchase price the copies then remaining in the dealers' hands, they must be so resold to him on demand.

"VIII. That when the publisher sells at retail a net book published under the rules, it shall be at the retail price, and he shall add the cost of postage or expressage on all books sent out of the city in which the publisher does business.

"IX. That for the purpose of carrying out the above plan the directors of the association be authorized to establish an office and engage a suitable person as manager, and endeavor to secure from all dealers in books assent to the above conditions of sale. Under the direction of the board, the manager shall investigate all cases of cutting reported, and when directed shall send out notices to the association, jobbers, and the trade of any persons violating the above provisions, *after giving the person accused of such violation an opportunity to explain his action.*

"X. That it shall be the duty of all members of the association to report immediately to the said office all cases of the cutting of prices which may come to their knowledge.

"XI. That the association, through its agents and members, aid in the formation of booksellers' associations in the important centers and cities in the United States, the object of which associations shall be to assist the Publishers' Association in maintaining prices on net books as aforesaid, and to establish such lawful rules and regulations respecting the conduct of business in their locality as will tend to secure fair, honorable, and uniform methods of business in each important center or section of the country. That the association pledge itself to support such local associations by every means in its power in maintaining such lawful rules and regulations as may in this way be agreed to.

"XII. That in making sales and contracts of sales of their books involving future delivery, members shall stipulate that such delivery is contingent on the observance by the purchaser of the rules of the association."

That thereafter the American Booksellers' Association passed a so-called Reform Resolution No. 2 in April, 1904, which said resolution is as follows:

### Exhibit I.

### "Reform Resolution No. 2.

"Whereas, the American Publishers' Association has adopted a net price system, and entered into an agreement for its maintenance, by which the members of said association will cut off the supply of all their copyrighted books to any dealer who fails to maintain the net price of any or all copyrighted books published under the net price system:

"(1) Now, therefore, be it resolved, that this, the American Booksellers' Association, in convention assembled, accept the said net price system, with the distinct understanding that it is the intention of the American Publishers' Association to include copyrighted fiction under the net price system as rapidly as possible; and

"(2) Furthermore, be it resolved, that all members of the American Booksellers' Association shall give to each of the members of the American Publishers' Association, and to all publishers who co-operate with them in the maintenance of the net price system, our most cordial support; and that to this end we agree not to buy, not to keep in stock, nor to offer for sale, after due notification, the copyrighted books of any publisher who declines to support the net price system.

"(3) Furthermore, be it resolved, that we instruct our secretary promptly to notify all members of this association that this resolution is applicable and in force with reference to any publisher who shall have made it manifest. that he is unwilling to co-operate with this association, and with the members of the Publishers' Association, in the maintenance of the net price system.

"(4) Furthermore, be it resolved, that this resolution, on being ratified by two-thirds of the members of this association, voting by formal ballot, shall immediately become a law to each and all of the members of this association; and if it shall appear upon the presentment of any three members of this association that a member has purchased, put in stock, or offered for sale the copyrighted books of a publisher who has been formally denounced, such member shall be expelled from membership in this association, and all members of this association shall then and thereafter be restrained from supplying any copyrighted books to such expelled member at a discount from the usual retail price.

"(5) Furthermore, be it resolved, that all members of this association shall be restrained from furnishing any copyrighted books at less than the net or usual retail price to any dealer who shall have been denounced by the Publishers' Association for cutting the price of net copyrighted books, or for otherwise violating the net price system, and who shall have been therefor cut off by the members of the Publishers' Association from the supply of their copyrighted books.

"(6) Furthermore, be it resolved, that all members of this association shall endeavor to keep in stock and push the sale of net copyrighted books so long as they are reasonably in demand, provided such discount is allowed by the publishers to the dealers as will yield them a living profit; and they shall maintain the net prices of the same in accordance with the terms of the publishers' agreement for the maintenance of the net price system.

"I [or we] hereby vote to rescind Reform Resolution No. 1 and to adopt Reform Resolution No. 2.

"[Signed]        Name.........................................
                 "Address.........................................

"Dated March 10, 1904."

(17) That since May, 1901, the date that the first resolutions and agreements of the American Publishers' Association and the American Booksellers' Association and their respective members went into effect, and until April, 1904, a large majority of all the publishers, in numbers and extent of business, including the complainant here-

in, and a large majority of all the booksellers throughout the United States, consisting of about 90 per cent. both in numbers and in extent of business, have obeyed the rules and regulations of the two associations as from time to time amended. They and each of them refused to sell or sanction the sale of any books of any kind, whether copyrighted or uncopyrighted, whether published by any member of the American Publishers' Association or not, to any dealer throughout the United States who did not maintain at retail the net or restricted price at which each copyrighted book was published under the net price or restricted price system, nor would they sell or sanction the sale of any books of any kind to any one who was known or believed to sell such net or restricted copyrighted books at retail at less than the net or restricted price, nor would they sell or sanction the sale of any books of any kind to any one who sold books of any kind to a price-cutter on copyrighted books, or who was known or believed to supply a price-cutter with any books of any kind; and when any dealer or person sold any net price books or restricted price books at less than the net or restricted price, or any jobber or wholesaler supplied a price-cutter with any books of any kind, or was known or believed to so supply him, the two associations circulated and published notices warning all persons in the trade, whether members of either of such associations or not, that the book supply of such persons had been cut off pursuant to the rules of the two associations.

(18) That since April, 1904, any dealer who does not maintain the net or restricted price at retail of any copyrighted book published by any member of the Publishers' Association under the net price or restricted price system cannot purchase any copyrighted books of any kind from any of the members of either of the associations at less than the retail price, whether such copyrighted book is published by any of the members of the associations or not, and whether such copyrighted book was published under the net price system or not, or prior thereto.

(19) That the defendants were placed on the cut-off list in May, 1901, because they refused to maintain the net retail price of $1.40 on the copyrighted book "Tarry Thou Till I Come," published by Funk & Wagnalls, but uniformly sold the same at retail at $1.24; and since said time their name has been circulated monthly upon the list of dealers whose supplies have been cut off under the rules of the two associations, and against whom the trade at large was warned as price-cutters and as coming under the rules of the two associations as dealers to whom books should not be sold, and, furthermore, that books should not be sold to any one who in turn was known or believed to resell the same to these defendants. That since March, 1904, the rules have been amended and relaxed as above set forth, so as to permit dealings with the defendants in uncopyrighted books only. That as to all copyrighted books of any and all kinds the members of said associations are not permitted under the rules to sell to the defendants, nor to sell to any one who resells or is believed to resell to the defendants; and the cut-off lists or blacklists have been published against these defendants and

against such other dealers as have been cut off from their supply of books, copyrighted or otherwise, without any interruption or intermission from the time they were first included in the list of dealers whose supplies were cut off until the present time, without any change in the method employed prior to the passage of the last amendment, which eliminated uncopyrighted books from the rules.

(20) That such combination and agreement as hereinbefore described are now in force, and that it is intended by the members of the two associations and the two associations to continue them in force.

(21) That the complainant was, since May, 1901, a member of the American Publishers' Association, and a party to all the agreements of said association hereinbefore set forth, and obeyed and lived up to all the rules and regulations of the American Publishers' Association hereinbefore set forth, and published all its books, including "The Castaway," in accordance with the rules and regulations of the association above set forth.

(22) That the members of the said two associations, including the complainant herein, do now, and at all the times herein mentioned have, resided and carried on their business of selling books in many different states, and, in the conduct of their respective business as publishers and wholesale and retail dealers in books, the members of the said two associations, including the complainant, were and now are engaged in the business of purchasing books, copyrighted and uncopyrighted, from each other and from other persons, in many states other than the states in which the purchasers resided, or now reside, and do business; and all such books were and have been transported, in compliance with the contract of purchase, from the state where such books were purchased to the purchaser, and delivered to the purchaser in the state where he resided, or now resides in and conducts his business, and members of both of such associations, including the complainant herein, also sell and have sold books to many persons who are not members of the said associations, in states other than the ones in which the sellers reside and conduct their business, and all such books were and have been transported, in compliance with the contract of purchase, from one state to another, and then delivered to the purchaser, and all the rules, regulations, and agreements made by the said two associations and its members, including the complainant, as hereinbefore set forth, were intended to be applied and be enforced, and have been and are now applied to and enforced, against all publishers and dealers in books throughout all the states of the United States, whether such publishers and dealers were or were not members of either of such associations, and whether they purchased books in one state for transportation and delivery in another, or for delivery in the state where purchased.

(23) That the members of the said two associations, including the complainant herein, have heretofore produced, distributed, and sold, and still produce, distribute, and sell, the majority of all books purchased and dealt in throughout the state of New York and all other states and territories of the United States.

From these facts, which are conceded, it appears that the original purpose of the combination and agreement of the association of publishers, including the complainant, was (1) to maintain the net retail price of all copyrighted books published by the members of such association, or any of them, at such price per book as might be fixed by the publisher of that book, and (2) to prevent the sale at retail of any one or more of such copyrighted books by any dealer in books at retail at a less price per copy than that so fixed. (See finding 10.) Thereupon the persons, firms, and corporations in the combination, including the complainant, formed a corporation under the name "American Publishers' Association." This corporation included a large majority of all the publishers of all books, both copyrighted and uncopyrighted, in the United States. This corporation, immediately on its organization, adopted the resolution (Exhibit A), and it and its members entered into an agreement with each other, and combined together to do the acts and things, and refrain from doing the acts and things, mentioned in such resolution (Exhibit A). That subdivision or paragraph III thereof was illegal and in restraint of interstate commerce is perfectly plain. (See finding 22.) In fact, the effect of the decision of the Court of Appeals of the state of New York, quoted in the findings (finding 15), is so to declare. By paragraph or subdivision X of such resolution the combination to keep up the price of books and limit and restrain interstate commerce was to be further extended. Thereupon the American Booksellers' Association was formed. (See finding 12.) That the object and purpose as there set forth was illegal cannot be doubted. We now have the combination extended to at least 90 per cent. of the booksellers of the United States, and including, not only 90 per cent. of all booksellers, but 90 per cent. of all publishers of books. The combination as existing under those resolutions, etc., is not confined to publishers and sellers of copyright books, but includes the publishers and sellers of all books. The declared object and purpose of this combination is (1) to fix the retail price of books; (2) to maintain such retail price; (3) to refuse to furnish or sell any books to any dealer in books who does not maintain such prices—that is, who sells a book at less than the fixed price; (4) to compel all publishers and dealers in books, in practical effect at least, to come into the combination and enforce and maintain these prices, or be blacklisted and driven from the business; (5) to drive out of the business of general publishing and bookselling all who refuse or neglect to maintain these prices. The freedom of the owner of a book—any book, except those specially excepted—duly purchased and paid for to sell the same, soiled or injured, or read and no longer desired, was thus attempted to be destroyed. The right of a retail bookseller to sell to the purchaser of 50 books for his library at a less price than to the purchaser of one book must not be exercised under the pain and penalty of having his supply of books cut off and of being driven from the business and financially ruined. (See Exhibit B, finding 12.) As to what was done in restraint of interstate commerce, see finding 13.

. An attempt was then made by the American Publishers' Association to eliminate the vicious provision of the written agreements and resolutions adopted by the combination by the substitution of article or subdivision III of Exhibit H. (See finding 16.) This must be read with the words included in brackets left out. The American Booksellers' Association followed, with the adoption of Exhibit I, or "Reform Resolution No. 2." In finding 17 is set out what was done up to April, 1904. What has been done by the combination since April, 1904, is set out in finding 18. As appears from finding 19, the defendants were put on the so-called cut-off list, or blacklist, in May, 1901, when the unmodified agreement or combination was being enforced. Its offense was in refusing to maintain the retail price of a copyrighted book, however. Defendants' name has not been taken from the list at any time. It is found and conceded that the complainant is living up to and enforcing the agreements, rules, and regulations aforesaid, as modified, of course, and has published and is publishing all its books, including "The Castaway," because thereof, and in accordance and compliance therewith. It follows, necessarily, from the facts recited from 1 to 23, inclusive, and is found as a further fact, that the notice in "The Castaway," on the page following the fly leaf, viz.: "The price of this book at retail is one dollar net. No dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an infringement of the copyright. The Bobbs-Merrill Company"—is an act done by the complainant, acting in combination with the said American Publishers' Association and the American Booksellers' Association, and the members thereof, in execution of the said combination and agreement, and for the purpose of enforcing same, and because of the said combination and agreement as evidenced by the acts of, and the resolutions and rules adopted and made by, such associations, and agreed to and being executed by the members of said association, including this complainant. It also follows and is found as a fact that such notice was put in such books, and that its enforcement as an alleged license agreement is attempted, by means of this action, not because the complainant reserved or intended to reserve to itself any interest in said books containing such printed notices, nor because it merely licensed or intended to license the purchasers thereof, who purchased same in the first instance from the complainant, to use or sell such books in a certain way, or on certain terms and conditions, or at certain prices, but as an attempt by complainant, as a member of said American Publishers' Association, to enforce as against this defendant the rules of such associations and combination fixing prices, in an effort to maintain them. It is part of a scheme, and the right of the complainant to maintain this action depends on the validity of that scheme or combination. Is such notice in such books sufficiently explicit in its terms to constitute a license agreement or contract, or any restriction on or modification of the absolute title thereto in the defendant? It does not purport to reserve to the complainant any interest in the book, or any right to control it, or the action of its owner in his use and disposition of it, except by possible inference.

In Heaton Peninsular Button-Fastener Co. v. Eureka Specialty Co. et al., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728, the owner of a patent for fastening buttons to shoes with metallic fasteners made and sold the machines with this notice on a metal plate, so conspicuously fastened thereto that all must see it, and so securely fastened as to constitute substantially an integral part of the machine, viz.:

"Condition of Sale. This machine is sold and purchased to use only with fasteners made by the Peninsular Novelty Company, to whom the title to said machine immediately reverts upon violation of this contract of sale."

Here is a plain, unequivocal statement, one that cannot be misconstrued or misunderstood, that there is a condition attached to the sale, viz., that the machine is to be used with fasteners of·a certain make only, and that a use with other fasteners will be such a violation of the agreement as to defeat the title or right given. This was seen by the purchaser, and he took the machine on that condition, and by so doing agreed to the condition and became bound thereby. He became a mere licensee. He acquired the right to use that machine in a certain way only.

In Cortelyou and Another and Neostyle Company v. Charles Eneu Johnson & Co. (recently decided by this court) 138 Fed. 110, the patented rotary neostyle was sold with this notice on a metal plate firmly and conspicuously attached thereto, viz.:

"License Agreement. This machine is sold by the Neostyle Company and purchased by the user with the express understanding that it is licensed to be used only with stencil paper and ink (both of which are patented), made by the Neostyle Company New York City."

When the purchaser took this machine he assented to this condition and became bound by it, and became a licensee. He is told that he is licensed to use the machine in a certain way and with certain supplies only. Had he been licensed to sell only—that is,. made an agent to sell—and empowered to sell at a certain fixed price only, it is unquestionably true that, had he violated the agreement by selling at a lower, or even a higher, price, he could have been enjoined. Having the sole power to vend his patented articles, he would undoubtedly have the right to fix the price at which they should be sold, and stop sales made by his agents and licensees in violation of the authority conferred. This is now settled as to a patent right. Bement v. National Harrow Co., 186 U. S. 70, 88, 92, 93, 22 Sup. Ct. 747, 46 L. Ed. 1058. In the opinion in that case (pages 92–93, 186 U. S., page 755, 22 Sup. Ct., 46 L. Ed. 1058), we find the following:

"The contracts plainly look to the sale, and they also determine the price of the article sold, throughout the United States, as well as to the manufacture in the state of Michigan. As these contracts do, therefore, include interstate commerce within their provisions, we are brought back to the question whether the agreement between these parties with relation to these patented articles is valid within the act of Congress. It is true that it has been held by this court that the act included any restraint of commerce, whether reasonable or unreasonable. United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addystone

Pipe, etc., Company v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136. But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions, imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. * * * The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article."

In Victor Talking Machine et al. v. The Fair, 123 Fed. 424, 61 C. C. A. 58, the syllabus reads:

"The owner of a patent, who manufactures and sells the patented article, may reserve to himself, as an ungranted part of his monopoly, the right to fix and control the prices at which jobbers or dealers buying from him may sell to the public, and a dealer, who buys from a jobber with knowledge of such reservation and resells in violation of it, is an infringer of the patent."

And in the opinion, after stating that the grant of a patent by its terms covers three separate or separable fields, the learned judge giving the opinion says:

"The field of sale is as much within the monopoly as the others, and so it has been decided. Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. And in Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960, and Same v. Pike (C. C.) 116 Fed. 863, the holdings were that a patentee may reserve to himself, as an ungranted part of his monopoly of sale, the right to fix and control the prices at which jobbers and dealers may sell the patented article to the public, and that whoever without permission enters the reserved portion is an infringer."

In the Victor Talking Machine Case, supra, the notice affixed to the machine read:

"Notice. This machine, which is registered in our books No. ———, is licensed by us for sale and use only when sold to the public at a price not less than $———. No license is granted to use this machine when sold at a less price. * * * A purchase is an acceptance of these conditions. All rights revert to the undersigned in the event of any violation.

"Victor Talking Machine Co."

In the Edison Phonograph Company Cases, cited (see supra) by Judge Baker in the Victor Talking Machine Case, supra, there was a restrictive contract, and this was referred to in the following language by a notice on the box containing the instrument when sold, viz.:

"Notice to Dealers. This record is sold subject to restrictions as to the persons to whom and the prices at which it may be sold. Any violation of such restrictions makes the seller or user an infringer of the Edison patents."

A reference to the case in 116 Fed. 863, will show that the restriction was very clear and explicit. The notice in "The Castaway" does not suggest a restriction upon the title to the book, or that the person or persons taking the book for sale are obtaining anything short of an absolute title, and no one would suppose that the

publisher of the book would attempt or assume to fix the price at which dealers should sell after obtaining absolute title to the book from such publisher. The words, "No dealer is licensed to sell it at a less price," are notice that licensees, not absolute owners, are so restricted. The words, "and a sale at a less price will be treated as an infringement of the copyright," clearly do not even tend to make such a sale by an absolute owner of such books an infringement of the copyright.

It is a close question whether a copyright may be infringed by selling in violation of express and explicit restrictions placed on the dealer, expressly made an agent or licensee only, as to the mode of sale or the price at which same is to be sold. Act March 3, 1891, c. 565, 26 Stat. 1106 [U. S. Comp. St. 1901, p. 3406], entitled "An act to amend title sixty, chapter three, of the Revised Statutes of the United States, relating to copyrights," amends section 4952 so as to read:

"The author * * * or proprietor of any book * * * shall, upon complying with the provisions of this chapter have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending the same."

Section 7 of that act (26 Stat. 1109 [U. S. Comp. St. 1901, p. 3413]) amends section 4964 of the Revised Statutes so as to read as follows:

"Every person, who after the recording of the title of any book and the depositing of two copies of such book, as provided by this act, shall, contrary to the provisions of this act, within the term limited, and without the consent of the proprietor of the copyright first obtained in writing, signed in the presence of two or more witnesses, print, publish, dramatize, translate, or import, or knowing the same to be so printed, published, dramatized, translated, or imported, shall sell or expose to sale any copy of such book, shall forfeit every copy thereof to such proprietor, and shall also forfeit and pay such damages as may be recovered in a civil action by such proprietor in any court of competent jurisdiction."

This section declares what acts constitute a violation of the copyright of a book. It declares that, to constitute a violation of the copyright, the offender must have, within the term limited—that is, the life of the copyright—and without the consent of the proprietor thereof, first obtained in writing and executed in the presence of two or more witnesses, printed or published or imported, contrary to the provisions of the act, such copyrighted book, or contrary to the provisions of the act, within such time and without such consent, must have sold or exposed to sale a copy of such copyrighted book, known to have been illegally printed. In substance this section declares that it is an infringement of a copyright to print or publish the copyrighted book without the consent of the proprietor, given in writing, signed in the presence of two witnesses, or to import a copy of such book without such consent, or knowingly to sell or expose for sale a copy or copies of such copyrighted book when unlawfully printed or imported. From this it would appear that an infringement by the sale of a copyrighted book consists in the selling or exposing for sale of a copy of such book that has been unlawfully printed or imported. If this be the law, it is not an

infringement of a copyright to sell or expose for sale a copy or copies of such book, when the same was lawfully printed or lawfully imported. The result would be that it is not an infringement of the copyright of a book to sell a copy or copies thereof lawfully printed, as in this case, in violation of a mere condition imposed upon a dealer by the publisher, by which such dealer agrees not to sell below a certain price; the title to the book having been vested in such dealer by the publisher thereof, or even in cases where the absolute title had not passed to the dealer. If the publisher of the book, being the proprietor of the copyright, parts with the title to such book, either a single copy or any number of copies, and receives his pay therefor, he has voluntarily parted with all control over that or those particular books. The owner of those books is neither a licensee nor an agent. He has the absolute property therein, and the absolute ownership of an article of personal property carries with it the right to give away or sell for such consideration as the owner sees fit to impose, prescribe, or demand, so long as he violates no law. This view of the copyright laws of the United States, as amended by the act of March 3, 1891, seems to be taken by Macgillivray in his work on the Law of Copyright, p. 287, c. 4, § 2. He there says:

"Prohibited Acts and Remedies. It is an infringement, subject to the remedies stated below, to do any of the following acts in respect of a copyrighted work: In the case of books, without the consent of the proprietor, in writing, signed in the presence of two witnesses (1) to print or publish; (2) to dramatize or translate; (3) to import; (4) knowingly to sell or expose for sale copies unlawfully made or imported."

We find no suggestion that it is an infringement of the copyright of a book for the owner of the book to sell copies at a price which violates a valid contract between the publisher of the book and the dealer, and which was made at the time such dealer became the owner.

In Harrison v. Maynard, Merrill & Co., 26 U. S. App. 99, 61 Fed. 689, 10 C. C. A. 17, the complainants, publishers of books and the owners of a copyrighted book, sent a quantity of the printed and unbound sheets of such book to the bindery of one Alexander for binding, and such sheets were to be stored until complainants should order bound copies. Sometimes they bound copies in advance. A fire occurred in the bindery, and both complainants and Alexander supposed the commercial value as books of all such bound or unbound sheets of such book in such bindery was destroyed. On examination complainants' agent so reported. Thereupon Alexander, without objection from complainants, sold the entire débris to one Fitzgerald, who, without moving it, sold same to some dealers in old paper. Alexander imposed no restriction or condition when he sold. Fitzgerald, who had become the owner of the débris, including the printed sheets and bound volumes, put this condition and restriction in the bill of sale:

"It is understood that all paper taken out of the building is to be utilized as paper stock, and all books to be sold as paper stock only, and not placed on the market as anything else."

Harrison, a dealer in books, visited the place and purchased of these dealers in old paper some of the volumes of the copyrighted book not destroyed, and put them on the market. He had no notice of the restriction or condition put in the bill of sale given by Fitzgerald. Complainants, owners of the copyright, brought suit to enjoin such sale by Harrison. On these facts the court (Wallace, Lacombe, and Shipman, Circuit Judges) held that, so long as the owner of a copyright retains the title to the copies of the book which he has the exclusive right to vend by virtue of the copyright, he can impose restrictions upon the manner in which and upon the persons to whom the copies are to be sold. They also held that if the agents of the owner of the copyright, intrusted with the possession of such books, violates his instructions and fraudulently sells to a person who has knowledge of the restrictions, such sale by the agent constitutes a fraud upon the owner of the copyright, and that such fraud constitutes an infringement of the copyright, with which the owner has never parted, and that such fraud—meaning, of course, such sales—can be restrained by virtue of the statutes applicable thereto. The court states that this right to enjoy the benefit of the copyright statutes results from the the fact that the owner has never parted with the title to the book or the copyright, although he may have parted with the possession of the book. The court also holds that the right to restrain the sale of a particular copy of the book by virtue of such statutes has gone when the owner of the copyright and of that copy has parted with all his title to it, and has conferred an absolute title to the copy upon a purchaser, although with an agreement for a restricted use. If this is true of one particular book, it is also true of a large number of copies. The court also says, in substance, that the new purchaser cannot reprint the copy, but that, the copy having been absolutely sold to him, the ordinary incidents of ownership in personal property, among which is the right of alienation, attaches to it. The court further says:

"If he has agreed that he will not sell it for certain purposes or to certain persons, and violates his agreement and sells to an innocent purchaser, he can be punished for a violation of his agreement; but neither is guilty under the copyright statutes of an infringement. If the new purchaser participates in the fraud, he may also share in the punishment."

The court cites in support of these statements Clemens v. Estes, 22 Fed. 899. If this be a correct statement of the law, and this court does not doubt that it is, we recur to the simple proposition whether or not the complainant in the case now under consideration, the Bobbs-Merrill Company, retained any title in the books in question by printing on the page following the title-page the statement: "Copyright 1904. The Bobbs-Merrill Company. May." And thereunder the statement:

"The price of this book at retail is one dollar net. No dealer is licensed to sell it at a less price, and a sale at a less price will be treated as an infringement of the copyright. The Bobbs-Merrill Company."

The defendants in this case purchased 90 per cent. of its copies of this book from dealers at wholesale at a reduction of 40 per cent. from said mentioned retail price. The other 10 per cent. of their

copies they purchased at retail, paying the full retail price therefor. The defendants knew of the statement printed in said books above quoted, and knew that it was printed in each copy of the book. The wholesale dealers from whom the defendants purchased their copies obtained such copies either from complainants direct or from other wholesale dealers at a discount from the above-mentioned retail price. Such wholesale dealers knew that the book was copyrighted, and were familiar with the said statement printed in each copy thereof. The books that came to the defendants prior to reaching them did not pass through the hands of any person or persons who were ignorant of the said notice printed therein. It is expressly found, however, and conceded, that these wholesale dealers from whom the defendants here obtained their copies were under no agreement or obligation to enforce the observance of the terms of said notice by retail dealers, or to restrict their sales of copies of such book to retail dealers who would agree to observe the said notice.

As has been stated, the notice contains no suggestion that the title of the purchaser to the book is in any way limited. The notice is that the price of the book at retail is one dollar net; and, if the words "no dealer" are to be construed as referring solely to retail dealers, then the notice is that the Bobbs-Merrill Company has not licensed any retail dealer to sell the book at retail for less than one dollar per copy. The fair meaning of this is that, in cases where the Bobbs-Merrill Company has granted a license to some retail dealer or dealers to sell the book, such licensee or licensees are limited and restricted in his or their authority; but the notice is not a suggestion or an intimation to any person that those who buy and pay for the book in the open market, or even of the Bobbs-Merrill Company, without entering into an express license agreement different from that suggested by this notice, are bound or obligated in any way to demand one dollar per copy for such book. It well may be that the Bobbs-Merrill Company has licensed or will license certain dealers to sell this book, and when it grants a license it has the right to impose conditions on its licensees; but this notice does not state or suggest that every purchaser of one of these books containing this notice becomes a licensee with a limited title, or, in fact, no title, to the book. A person cannot be both licensee and absolute owner.

Again, it is contended that the words "the price of this book" refer to the particular copy containing the notice, and that the words "no dealer is licensed to sell it" refer to the particular copy containing the notice. It is further contended that the court is bound to give this construction to this language, and that therefore the defendants, having knowledge of the notice, assented to the proposition and in effect entered into a contract or agreement with the Bobbs-Merrill Company whereby they became its agents to sell the copies at one dollar per volume, and no less, or its licensee with power to sell such books, for which it had paid the wholesale dealer the price demanded, at one dollar per copy only. This court refuses to give that construction to this notice. This court declines to hold

that the words in such notice "this book" and "it" refer to the particular copy of the book in which the notice is found. The language of the notice is a general statement, referring to the book known as "The Castaway" generally, and not to any particular copy or copies thereof, and, at best, is but a notice that licensees of the publishers are only at liberty to sell such book at one dollar per copy. The notice forms no part of a contract between the purchaser from the publisher and such publisher, nor does it limit or restrict the title of the purchaser. And this court will say here that it would be lending itself to the perpetration of a fraud upon the public should it hold differently. If the Bobbs-Merrill Company, in putting its books upon the market, desires to say to wholesalers and to retailers that it is not selling the entire title to the copies put upon the market, let it say so in plain and unambiguous terms. Let it say in its notice that the purchaser of copies of the book from either the publisher or any wholesale or retail dealer is obtaining but a limited or qualified title in the copies purchased, or that in purchasing one or more copies such purchaser becomes but a mere licensee of the publisher, without title to the copies, and with power to dispose of the same only on receiving a specified sum of money. The Circuit Court of Appeals, in Harrison v. Maynard, Merrill & Co., supra, also quotes with approval the language of Judge Hammond in Henry Bill Publishing Co. v. Smythe (C. C.) 27 Fed. 914–925, viz.:

"The owner of the copyright may not be able to transfer the entire property in one of his copies and retain for himself an incidental power to authorize a sale of that copy, or, rather, the power of prohibition on the owner that he shall not sell it, holding that much, as a modicum of his former estate, to be protected by the copyright statute; and yet he may be entirely able, so long as he retains the ownership of a particular copy for himself, to find abundant protection under the copyright statute for his then incidental power of controlling its sale. This copyright incident of control over the sale, if I may call it so, as contradistinguished from the power of sale incident to ownership in all property—copyrighted articles, like any other—is a thing that belongs alone to the owner of the copyright itself, and as to him only so long as and to the extent that he owns the particular copies involved. Whenever he parts with that ownership, the ordinary incident of alienation attaches to the particular copy parted with in favor of the transferee, and he cannot be deprived of it. This latter incident supersedes the other—swallows it up, so to speak—and the two cannot coexist in any owner of the copy, except he be the owner at the same time of the copyright; and, in the nature of the thing, they cannot be separated, so that one may remain in the owner of the copyright as a limitation upon or denial of the other in the owner of the copy."

In Garst v. Hall & Lyon Co., 179 Mass. 588, 61 N. E. 219, 55 L. R. A. 631, decided October 17, 1901, without dissent, the court, speaking of copyrights, said:

"The law of copyright also gives privileges to authors and publishers that do not pertain to property which anybody may make and sell if he can; but even under the law of copyright, when the owner of a copyright and of a particular copy of a book to which it pertains has parted with all his title to the book, and has conferred an absolute title to it upon a purchaser, he cannot restrict the right of alienation, which is one of the incidents of ownership in personal property. Harrison v. Maynard, 61 Fed. 689, 10 C. C. A. 17. See, also, Clemens v. Estes (C. C.) 22 Fed. 899; Meyer v. Estes, 164 Mass. 457.

41 N. E. 683, 32 L. R. A. 283; Waterman Co. v. Waterman, 27 App. Div. 133, 50 N. Y. Supp. 131."

The same doctrine is plainly expressed in Keeler v. Standard Folding Bed Company, 157 U. S. 659, 15 Sup. Ct. 738, 39 L. Ed. 848. In that case it was held that one who purchases patented articles of manufacture from one authorized to sell them at the place where sold becomes possessed of an absolute property in such articles, unrestricted in time or place. In that case the complainants were the assignees for the state of Massachusetts of certain letters patent granted to one Welch. This assignment as matter of course gave to the complainants the rights of the patentee in and for the state of Massachusetts, viz., the sole right to make, use, and sell the patented article in that state. The Welch Folding Bed Company owned the patent rights for the state of Michigan, and it of course had the same right to make, use, and vend the patented article in that state. The defendants purchased a car load of the patented articles from the Welch Folding Bed Company at Grand Rapids in the state of Michigan. It proposed to sell these articles in the state of Massachusetts, and thereafter did sell some of such articles in the state of Massachusetts, and was engaged in selling the remainder in that state at the city of Boston when the bill of complaint was filed. The Supreme Court held that the defendants, having purchased the patented articles in Michigan from the assignee of the patent for the territory included within the boundaries of the state of Michigan, had the right to sell them anywhere within the United States, including the state of Massachusetts, notwithstanding the fact that all the patent rights for the state of Massachusetts had been assigned to another person, to wit, to the complainants. The decision is based upon the proposition that where the patentee, not having parted with his rights granted by the patent, makes and vends a patented article, the purchaser can use the article in any part of the United States, and, unless restrained by contract with the patentee, can sell or dispose of the same in any part of the United States. The court says:

"It has passed outside of the monopoly, and is no longer under the peculiar protection granted to patented rights."

The court approves the language of Mr. Justice Clifford in Goodyear v. Beverly Rubber Co., 1 Cliff. 348–354, Fed. Cas. No. 5,557, wherein he states, in substance, that, the patentee having manufactured the article and sold it for a satisfactory compensation, the patentee, so far as that quantity of the product of his invention is concerned, has enjoyed all the rights secured to him by his letters patent, and the manufactured article, and the material of which it is composed, go to the purchaser for a valuable consideration, discharged of all the rights of the patentee previously attached to or impressed upon it by the law under which the patent was granted. The court further says:

"If, as is often the case, the patentee has divided the territory of the United States into 20 or more specified parts, must a person who has bought and paid for the patented article in one part, from a vendor having an exclusive right to make and vend therein, on removing from one part of the country

to another, pay to the local assignee for the privilege of using and selling his property, or else be subjected to an action for damages as a wrongdoer? And is there any solid distinction to be made in such a case between the right to use and the right to sell?"

The court then cites with approval several cases, and especially the language of Mr. Justice Clifford in Mitchell v. Hawley, 16 Wall. 544, 546, 547, 21 L. Ed. 322, as follows:

"Patentees acquire by their letters patent the exclusive right to make and use their patented inventions, and to vend to others to be used, for the period of time specified in the patent; but when they have made one or more of the things patented, and have vended the same to others to be used, they have parted to that extent with their exclusive right, as they are never entitled to but one royalty for a patented machine, and consequently a patentee, when he has himself constructed a machine and sold it without any conditions, or authorized another to construct, sell, and deliver it, or to construct, use, and operate it, without any conditions, and the consideration has been paid to him for the thing patented, the rule is well established that the patentee must be understood to have parted to that extent with all his exclusive right, and that he ceases to have any interest whatever in the patented machine so sold and delivered or authorized to be constructed and operated. Where such circumstances appear, the owner of the machine, whether he built it or purchased it, if he has also acquired the right to use and operate it during the lifetime of the patent, may continue to use it until it is worn out, in spite of any and every extension subsequently obtained by the patentee or his assigns."

At page 666, 16 Wall., 21 L. Ed. 322, the court calls attention to the case of Wilson v. Rousseau, 4 How. 646, 11 L. Ed. 1141, and says that it was there held that:

"As between the owner of a patent on the one side, and a purchaser of an article made under the patent on the other, the payment of a royalty once, or, what is the same thing, the purchase of the article from one authorized by the patentee to sell it, emancipates such article from any further subjection to the patent throughout the entire life of the patent, even if the latter should be by law subsequently extended beyond the term existing at the time of the sale; and in respect of the time of enjoyment, by those decisions the right of the purchaser, his assigns, or legal representatives is clearly established to be entirely free from any further claim of the patentee or any assignee."

The court then says:

"Upon the doctrine of these cases we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws."

In the case now before this court it appears that the publisher of the book "The Castaway" printed and sold these copies. It put them upon the market. It received its price therefor, and reserved no right to demand any further compensation. The defendants purchased in the open market and paid the price demanded. It is conceded that the wholesalers of whom the defendants purchased were under no contract or obligation to impose any condition upon the defendants, and they did not. There is no privity of contract between the defendants and the complainants. There is no sug-

gestion in the notice that the retail dealer who buys the copies of the book in the open market enters into any contractual relation with the publishers. It is not stated that the copy of the book is sold on condition that the purchaser will abide by and enforce the price arrangement. The notice is assertive in its terms. It is a dictum. It says that the price of the book at retail is one dollar net. The plain meaning of this language is that if the signer of the notice sells a copy of the book, or the book in question, containing the notice, at retail, the price is one dollar. The notice also asserts that the Bobbs-Merrill Company has not licensed any retail dealer to sell at a less price. It does not say or suggest that the Bobbs-Merrill Company has not sold millions of copies of the book for the trade, parting with the title absolutely and unconditionally. This court is aware that the Keeler Case, cited above, is a patent, and not a copyright case; but the principle is the same.

In a supplemental brief filed by the counsel for the complainant, he states that he does not consider the notice published in the book as in the nature of a license. He says:

"In my opinion, the putting of the book upon the market and selling it by the owner of the copyright constitutes the license; and this notice published in the book is a limitation and qualification of that license. If the book is put out without any notice, the license is unqualified, and the sale is absolute; but my contention is that the owner of the copyright has the authority to restrict the license, and, being published in this way, the restriction attaches to the property, and is a charge and limitation upon the rights of all parties purchasing the book for resale."

This is a claim that the owner of a copyright for a book, who prints the book and sells it for a consideration, gives to the purchaser a license, and does not sell and convey a piece of personal property absolutely. The contention here is that any notice printed in a book and brought to the attention of the purchaser is a restriction of that license to that extent, and may be enforced, and that a violation of the obligation imposed by the notice is an infringement of the copyright which may be restrained by the federal courts. This doctrine, it seems to this court, is contrary to the adjudicated cases. I do not think this contention can be sustained upon principle. Clearly it is opposed to public policy. The purchaser of an article not patented may duplicate it if he can. The purchaser of an article made under a patent right may not duplicate it, but he may use the article purchased and sell the same as his own in any way or for any price he sees fit. The purchaser of a book not copyrighted may duplicate it—make copies or a reprint. The purchaser of a copyrighted book may not make or print or publish a copy, as this would be an infringement of the copyright; but this restriction in no way interferes with the absolute ownership of the particular copy of the book. The owner of an article made under a patent right or of a book printed under a copyright is in no sense a licensee of the patentee or of the owner of the copyright.

"License," with reference to real estate, is a permission or authority to do a particular act or a series of acts on the land of another without possessing any estate therein. So, with reference

to personal property, "license" implies and carries the power to do some act upon or in reference to or to do something with the property of another. Herein it differs from an easement. The word "easement" always implies an interest in the land. See Words & Phrases, vol. 5, tit. "License."

What is the Present Combination and Its Object, or Purpose?

1. The American Publishers' Association has adopted a net price system for all copyright books published or controlled by any member or members of the association and made an agreement to maintain it. By this agreement the members thereof are to cut off all supply of their copyrighted books to any dealer who fails to maintain the net price of such books as fixed by such association, or, what is the same thing, by its members. In short, this combination fixes the price of copyrighted books published by its members, and the price at which such books are to be sold, both at wholesale and at retail, and agrees not to furnish or sell any of these books to any dealer who fails to maintain such price; that is, demand and exact from the purchaser the price so fixed.

2. Another association, the American Booksellers' Association, assents to this, agrees to co-operate and be bound by such system and arrangement and to aid and assist in carrying it into effect, and to this end agrees not to buy, or keep in stock, or offer for sale, the copyrighted book of any publisher who refuses to join the combination and enforce this price system and demand and exact of the customer this price fixed by the combination. Two-thirds of the members of this association govern. If any member fails to live up to the agreement, etc., he may be expelled, and he is not to have books, and all members are "restrained" from supplying books, etc. (See subdivisions 4 and 5 of Exhibit I.) The objects are: (1) To compel the would-be owners and readers of copyrighted books to purchase their books of the members of this combination, made up of two combinations embracing at least 90 per cent. of all publishers and dealers in copyrighted books, at an arbitrary price fixed by the combination, regardless of the actual value of the book as determined by a demand therefor established in a free and open market or the condition of the books. (2) To compel all publishers of and dealers in copyrighted books to come into the combination, submit to and be controlled by it, and sell books at prices fixed by it, regardless of the value of the books, etc., or of the exigencies of the trade and situation of the seller, or be deprived of the privilege of purchasing, owning, and selling such books. In short, such as refuse to come in are to be crippled, or perhaps ruined, in their business. As the combination extends throughout the United States by the very terms of the agreement, interstate commerce is necessarily restrained. A judgment for the complainants in this action will restrain interstate commerce.

If this suit is one to restrain the infringement of a copyright, granted to the complainant and now owned by it, by the doing of any act that constitutes infringement of that right, and defendant has infringed, it is entirely immaterial that the combination

described exists, or that complainant is a member thereof, or that its objects are those described. It is no defense to such a trespass upon the complainant's rights that it has violated and is violating the Sherman anti-trust law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), or some statute of the state of New York. In General Electric Co. v. Wise, 119 Fed. 922–924, this court so held, citing cases. This court there said:

"It is difficult to understand how or why a violation of the Sherman anti-trust law by this complainant, if there has been such a violation, confers any right on the defendant to infringe this patent. That act points out the penalties for its violation, and it is not understood that such law denies the grantees of patents the protection of the law because they may be violating some statute. However that may be, the evidence falls far short of establishing such a violation by this complainant. The testimony on that subject is squarely contradicted. An individual cannot confiscate the property or property right of a corporation on the ground it has violated that act. Soda Fountain Co. v. Green (C. C.) 69 Fed. 333; Columbia Wire Co. v. Freeman Wire Co. (C. C.) 71 Fed. 302; Bement v. Harrow Co., 186 U. S. 70, 88–91, 22 Sup. Ct. 747, 46 L. Ed. 1058. Harrow Co. v. Quick (C. C.) 67 Fed 131, cannot be accepted as authority on this question."

See, also, Strait v. National Harrow Co. (C. C.) 51 Fed. 819.

But if the complainant has turned over to the combination the fixing of prices, and has entered into the combination described, and becomes a party to the agreement for the purposes described, and is now, through this suit, attempting, as this court holds it is, to enforce such combination agreement in whole or in part, and such agreement is unlawful, because in violation of the act referred to, then this action cannot be maintained. The complainant confessedly is a party to the combination and the agreement, and cannot, if it be illegal, have a standing in a court of equity to enforce any part of it, directly or indirectly. When a complainant comes into court, asking equity, it must come with clean hands, so far as the transaction involved is concerned. If a party, person, or corporation, in attempting to violate the rights of the public and the rights of those persons who will not join in the attempted violation of law, suffers some injury to his property or property rights, which are being used by his consent by those who are thus violating the law, in perpetrating such violation, at the hands of one who is lawfully resisting such attempted injury, he or it cannot, while continuing the illegal acts, have an injunction to enjoin the resisting acts resulting in such injury. Each owner of the copyright of a book has a monopoly of that particular book. Copyrights, like patents, are assignable, and hence a person or a corporation may lawfully become the owner of any number of copyrights or of all the copyrights of books issued by the United States, and it is immaterial that the purpose is to monopolize the whole business of publishing and selling copyrighted books. In such case such person or corporation would hold and control all the monopolies for such copyrights of books, and he or it could print and sell, or print and not sell, or refuse to print at all, or refuse to allow others to print or publish. Should he or it print or publish one or more copies of these books, such person or corporation could appoint agents to sell and prescribe and limit their powers. He or it could

license one or more persons to sell, and prescribe the terms and conditions of such sale, and limit the price at which same should be sold.  Assume that such person or corporation has fixed the price at which such book shall be sold at retail by such agents and licensees, and may restrain a disposition of such books in violation of the conditions, we have no combination or conspiracy.  One man cannot combine or conspire.  It takes two or more to make a combination or a conspiracy.  So an agreement by all holders of copyrights to assign same to one person or corporation is but a sale of their own, and they may take pay in cash, horses, scrap iron, or licenses to sell the copyrighted book, provided they actually sell their copyrights.  If the agreement be a mere pretense, however, a mere cover for a combination to violate some statute, then such agreement to sell their copyrights would be void, and the whole combination would be illegal and void.  So one person may purchase and own all the hay, oats, or potatoes existing in the country.  If he becomes such owner, he may fix the price at which he will sell.  Here there is no conspiracy or illegal combination.  But if the several owners of such produce combine, and agree that they will fix prices, interfere with and limit interstate commerce, drive all other dealers and owners of similar property who will not join them in their purposes out of business, and deprive them, if possible, of their right to purchase and ship produce from state to state as a part of interstate commerce, we undoubtedly have an illegal combination, and no member of such a conspiracy can enforce in a court of equity any contract or agreement made in execution, in whole or part, of such a conspiracy.  It is evident that one may do, in fixing and enforcing prices, and in exacting tribute from the people and restraining interstate commerce, what two or more cannot do in pursuance of an agreement or combination.  A corporation, on becoming the owner of several patents or of several copyrights, may do all acts under each that the person to whom such rights were originally granted might have done.  Having become the owner, it is entitled to the benefits and privileges of the monopolies granted.  But all this affords no sanction or support whatever to the doctrine that the several owners of distinct patents, each having a monopoly of his particular patent, or the several owners of distinct copyrights, each having a monopoly of his particular copyright, may combine and conspire as to their patented articles, or as to their copyrights or books published under and protected thereby, to restrain interstate commerce in articles made or produced thereunder.  A right or privilege to form such a combination or conspiracy is not embraced or included within the monopoly granted.  The monopoly of one patentee cannot be extended and made more of a monopoly by that of another.  The grant of an exclusive right to make and vend a certain machine does not include a license to combine and conspire with another having a like exclusive right to restrain trade and commerce between the states in those articles, if made and put on the market, or to conspire not to put them on the market.  The right to elect not to make or sell is necessarily included.  The right to combine

and conspire is not. In any event the so-called Sherman law forbids any and all combinations in restraint of such commerce.

In the case of copyrighted books it is evident that, if the publisher of one or two should demand and exact of the purchaser at retail a grossly unreasonable price, he would sell but few, if any, copies. Others would supply the market, for readers would forego that book, or those books, and find reading matter elsewhere. But when all publishers of and dealers in copyrighted books—and nearly all new books are now copyrighted—combine to exact a fixed, arbitrary price, etc., the readers of books become powerless, if they would read at all, not because of the monopoly granted or sanctioned by the government in granting the copyright, but because of the new monopoly (the conspiracy of monopolists), created by the agreement and combination of these monopolists—one that is forbidden and denounced by Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], entitled "An act to protect trade and commerce against unlawful restraints and monopolies." Section 1 of that act reads:

"Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce amongst the several states, or with foreign nations, is hereby declared to be illegal."

It is not necessary that the effect necessarily be to restrain trade or commerce. It is sufficient if the combination may have that effect. It seems to this court impossible to hold that this section of the act does not apply to a combination of patentees to restrain trade and commerce in patented articles made under their patents as much as to such a combination made by dealers in other articles of commerce.

In 1 Page on Contracts, p. 698, § 445, after a statement regarding the law as to "Monopoly Contracts concerning Patents," it is said:

"But if the owners of distinct patents combine to prevent competition in business, and to control the price of the patented article, such combinations and all contracts for such purposes are as invalid as if the articles were not patented."

The following cases are cited to sustain the statement: National Harrow Co. v. Hench, 83 Fed. 36, 27 C. C. A. 349, 55 U. S. App. 53, 39 L. R. A. 299; National Harrow Co. v. Quick (C. C.) 67 Fed. 130; Vulcan Powder Co. v. Powder Co., 96 Cal. 510, 30 Pac. 1113, 31 Am. St. Rep. 242; Gamewell, etc., Co. v. Crane, 160 Mass. 50, 35 N. E. 99, 22 L. R. A. 673, 39 Am. St. Rep. 458.

In 1 State and Federal Control of Persons and Property (Tiedeman) 412–413, it is said:

"But the mere fact that the subject-matter of the monopolistic combination may be patent rights, covering machines employed in the same art or industry, will not protect the combination from the penal provisions of the anti-trust laws. If a corporation or association is formed among manufacturers and patentees of certain articles of kindred character, in order to control the trade and prices of such articles, the combination is nevertheless illegal, although the exclusive manufacture of the goods is guarantied by letters patent from the United States government."

At the time of that writing (1900) the author was not aware of the decision in Bement v. National Harrow Co., 186 U. S. 70, 22

Sup. Ct. 747, 46 L. Ed. 1058, which modifies some of the cases cited by him, but not in respect to the general doctrine stated.

In Bement v. Harrow Co., supra, the court, at page 94, 186 U. S., page 756, 22 Sup. Ct. (46 L. Ed. 1058), plainly intimates that the several owners of several patents may not combine to restrain commerce in their patented articles. It is unnecessary to cite many cases. If Montague & Co. v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, and Northern Securities Company v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, are to be respected as law and followed in cases where there is no hue and cry against railroads, this combination is illegal as in restraint of interstate commerce. If anything can be found in the prevailing opinion in John D. Park & Sons Co. v. Wholesale Druggists' Association et al., 175 N. Y. 1, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578, supporting the contention of the complainant here, it is sufficient to say that this court does not agree with the prevailing opinion or decision in that case, but does agree with the dissenting opinions of Martin, J., and Cullen, C. J., with whom Vann, J., concurred.

The defendants have not infringed and are not threatening to infringe complainant's copyright, nor have they violated any contract. The complainant is seeking to enforce against defendants an unlawful combination agreement, to which such defendants are not parties, and by which they have not consented to be bound to prevent defendants selling books of which they are the absolute owners. The same result on a similar state of facts as to the effect of such notice was reached by the court in Bobbs-Merrill Co. v. Snellenburg, 131 Fed. 530.

The defendants are entitled to a decree dismissing the complaint, with costs.